Filed 5/3/10                  NO. 4-09-0069

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| A.B.A.T.E. of Illinois, Inc., and K. GENE BEENENGA, | ) ) | Appeal from Circuit Court of |
| Plaintiffs-Appellants, | ) | Sangamon County |
| v. | ) | No. 06CH363 |
| ALEXI GIANNOULIAS, Treasurer, State of Illinois; DANIEL W. HYNES, Comptroller, State of Illinois; and PAT QUINN, Governor, State of Illinois, in Their Official Capacities, | ) ) ) ) ) | Honorable Leo J. Zappa, Jr., |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MYERSCOUGH delivered the opinion of the court:

Plaintiffs, A.B.A.T.E. of Illinois, Inc. (ABATE), and K. Gene Beenenga, appeal the trial court's order granting the motion of defendants Alexi Giannoulias, Daniel W. Hynes, and Pat Quinn for summary judgment and denial of their motion to reconsider.  We affirm.

I. BACKGROUND

ABATE is an Illinois general not-for-profit corporation whose members are motorcycle enthusiasts.  Beenenga is a member of ABATE and a motorcyclist.

Through Public Act 82-649, effective January 1, 1982 (Pub. Act 82-649, §§ 1 through 7, eff. January 1, 1982 (1981 Ill. Laws 3373-76)), the legislature enacted the Cycle Rider Safety Training Act (Act) (Ill. Rev. Stat. 1981, ch. 95 1/2, pars. 801 through 807), which included a Cycle Rider Safety Training Fund (CRST Fund) (Ill. Rev. Stat. 1981, ch. 95 1/2, par. 806).  The

Illinois Department of Transportation (Department) was given the "power, duty[,] and authority to administer [the] Act."  Ill. Rev. Stat. 1981, ch. 95 1/2, par. 803.  That version of section 6 stated the following with respect to deposits into the CRST Fund:

> "To finance the Cycle Rider Safety Training program and to pay the costs thereof, the Secretary of State will hereafter deposit in the State Treasury an amount equal to $4.00 for each Annual Fee, and $2.00 for each Reduced Fee, for the registration of each motorcycle, motor driven cycle[,] and motorized pedalcycle processed by the Office of the Secretary of State during the preceding quarter, which amount the State Comptroller shall transfer quarterly to a special fund to be known as 'The Cycle Rider Safety Training Fund', which is hereby created and which shall be administered by the Department.  Appropriations from the 'Cycle Rider Safety Training Fund' shall be made by the General Assembly only to the Department, and shall only be used for the expenses of the Department in administering the provisions of this Act, for funding of contracts with approved Regional Cycle Rider Safety Training Centers for the conduct of courses, or for

any purpose related or incident thereto and connected therewith. Whenever the total of the amount currently in the Cycle Rider Safety Training Fund and current grants to the Department from the federal government for cycle rider safety training in Illinois exceed $1,200,000, the Department will notify the Governor and the Governor may notify the State Comptroller and State Treasurer of the amount to be transferred from the Cycle Rider Safety [Training] Fund to the Illinois Road Fund so that said total approximately equals $1,200,000, and, upon receipt of such notification, the State Comptroller shall transfer such amount to the Illinois Road Fund." Ill. Rev. Stat. 1981, ch. 95 1/2, par. 806.

In January 1992, the legislature amended the former version of section 6 of the Act when it enacted Public Act 87-838 (Pub. Act 87-838, §6, eff. January 1, 1993 (1991 Ill. Laws 4782, 4810)). The new version became section 6 of the Act (625 ILCS 35/6 (West 1992)). Public Act 87-838 amended section 6 of the Act to allow funds in the CRST Fund to be transferred to the General Revenue Fund by adding the following paragraph to section 6 of the Act:

"In addition to any other permitted use of moneys in the Fund, and notwithstanding

any restriction on the use of the Fund, moneys in the Cycle Rider Safety Training Fund may be transferred to the General Revenue Fund as authorized by this amendatory Act of 1992.  The General Assembly finds that an excess of money exists in the Fund.  On February 1, 1992, the Comptroller shall order transferred and the Treasurer shall transfer $200,000 (or such lesser amount as may be on deposit in the Fund and unexpended and unobligated on that date) from the Fund to the General Revenue Fund."  625 ILCS 35/6 (West 1992).

In December 1992, the legislature again amended section 6 of the Act when it overrode then Governor Jim Edgar's veto and passed House Bill 1129, which became Public Act 87-1217, effective January 1, 1993 (Pub. Act 87-1217, §1, eff. January 1, 1993, (1216 Ill. Laws 3775, 3775-76)).  Because Public Act 87-1217 substantially changed section 6, we include it in its entirety and emphasize what plaintiffs maintain are the substantive changes to section 6 of the Act that are of import to this case:

"To finance the Cycle Rider Safety Training program and to pay the costs thereof, the Secretary of State will hereafter deposit with the State Treasurer an amount equal to each annual fee and each

- 4 -

reduced fee, for the registration of each motorcycle, motor driven cycle[,] and motorized pedalcycle processed by the Office of the Secretary of State during the preceding quarter as required in subsection (d) of Section 2-119 of the Illinois Vehicle Code [(625 ILCS 5/2-119 (West 1992))], which amount the State Comptroller shall transfer quarterly to a trust fund outside of the State treasury to be known as the Cycle Rider Safety Training Fund, which is hereby created.  In addition, the Department may accept any federal, State, or private moneys for deposit into the Fund and shall be used by the Department only for the expenses of the Department in administering the provisions of this Act, for funding of contracts with approved Regional Cycle Rider Safety Training Centers for the conduct of courses, or for any purpose related or incident thereto and connected therewith."  (Emphases added.)  625 ILCS 35/6 (West Supp. 1993).

Effective June 20, 2003, the legislature enacted an act relating to budget implementation (hereinafter BIMP), Public Act 93-32 (2004 BIMP) (Pub. Act 93-32, §50-5, eff. June 20, 2003 (2003 Ill. Legis. Serv. 400, 401 (West))), which amended the

- 5 -

State Finance Act (30 ILCS 105/1 through 40 (West 2004)) (2004 State Finance Act). Relevant to this case are sections 8h (30 ILCS 105/8h (West 2004)), 8j (30 ILCS 105/8j (West 2004)), and 8.42 (30 ILCS 105/8.42 (West 2004)). These amendments authorized the Treasurer and Comptroller to transfer amounts from certain funds held by the State Treasurer, including the CRST Fund (30 ILCS 105/8.42 (West 2004)), and from additional amounts created through the increase of fees to the General Revenue Fund upon direction from the Director of the Bureau of the Budget. 30 ILCS 105/8h, 8j (West 2004).

Effective July 30, 2004, Public Act 93-839 (2005 BIMP) amended the State Finance Act yet again. Public Act 93-839 (Pub. Act 93-839, §10-100, eff. July 30, 2004 (2004 Ill. Legis. Serv. 1381, 1407-08 (West))) amended section 8h of the State Finance Act to give the Governor the power to direct the Treasurer and Comptroller to transfer money from any fund held by the State Treasurer to the General Revenue Fund. 30 ILCS 105/8h (West Supp. 2005).

Later, Governor Blagojevich issued "Fund Transfer Notifications" directing the transfer of money from many of the State's funds, including the CRST Fund, into the General Revenue Fund. Defendants admit that $1,205,600 was transferred from the CRST Fund to the General Revenue Fund pursuant to the 2004 BIMP.

On June 9, 2006, plaintiffs filed a motion for temporary restraining order, asking the trial court to restrain defendants (Judy Baar Topinka was Treasurer and Rod Blagojevich

was Governor at the time) from transferring funds from the CRST Fund (and many other funds) to the General Revenue Fund. The trial court granted the temporary restraining order.

On June 12, 2006, plaintiffs filed a class-action suit for declaratory judgment, mandamus, preliminary injunction, and permanent injunction against defendants barring the transfer of funds from a number of funds, including the CRST Fund, to the General Revenue Fund. In relevant part, plaintiffs alleged that the transfer of funds from the CRST Fund to the State's General Revenue Fund pursuant to Public Acts 93-32 and 93-839 were unenforceable because the transfers were inconsistent with the CRST Fund's "enabling statute" and the transfers violated several constitutional provisions. On July 28, 2006, the trial court denied the motion for preliminary injunction. In August 2006, defendant Hynes filed a motion to dismiss that the trial court denied.

On April 30, 2008, defendants filed a motion for summary judgment. On August 12, 2008, plaintiffs filed a cross-motion for summary judgment. On October 23, 2008, the trial court granted summary judgment in favor of defendants. The court granted the motion because "the BIMP's in question were passed after the current CRSTF Act was enacted. The intent of the legislature was clear, and the more recent legislation (i.e., the BIMPs), it can be implied, repealed the statute in question, CRSTF." Moreover, the court found it was apparent from the fact that the legislature acted to prohibit transfers from specific

funds, but not the CRST Fund, that it intended the transfer from the CRST Fund to take place.  On January 5, 2009, the trial court denied plaintiffs' motion to reconsider.

This appeal followed.

## II. ANALYSIS

In this appeal, plaintiffs make two general arguments. Plaintiffs argue that because the monies in the CRST Fund are private, the legislature could not transfer the monies pursuant to the 2004 and 2005 BIMPs without violating the takings clauses of the Illinois and United States Constitutions.  Plaintiffs also contend that the 93rd General Assembly did not have the authority to transfer CRST Fund funds into the General Revenue Fund because the 87th General Assembly intended to place the CRST Fund beyond the powers of later legislatures to sweep and accomplished this by making the CRST Fund a "trust fund outside of the state treasury."

An appellate court reviews a trial court's order granting summary judgment de novo.  Reppert v. Southern Illinois University, 375 Ill. App. 3d 502, 504, 874 N.E.2d 905, 907 (2007).  "The purpose of summary judgment is not to try a question of fact, but to determine whether one exists."  Land v. Board of Education of the City of Chicago, 202 Ill. 2d 414, 421, 781 N.E.2d 249, 254 (2002).  Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits and exhibits, when viewed in the light most favorable to the nonmoving party, indicate that there is no

genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 2006).  "As in this case, where the parties file cross-motions for summary judgment, they invite the court to decide the issues presented as a matter of law."  Liberty Mutual Fire Insurance Co. v. St. Paul Fire & Marine Insurance Co., 363 Ill. App. 3d 335, 339, 842 N.E.2d 170, 173 (2005).

Further, the issue in this case is one of statutory interpretation.  This court reviews issues of statutory interpretation de novo.  Reppert, 375 Ill. App. 3d at 504, 874 N.E.2d at 907.  Our supreme court recently stated the following with respect to the rules of statutory construction:

> "The primary rule of statutory construction is to give effect to the intent of the legislature.  The best evidence of legislative intent is the statutory language itself, which must be given its plain and ordinary meaning.  The statute should be evaluated as a whole.  Where the meaning of a statute is unclear from a reading of its language, courts may look beyond the statutory language and consider the purpose of the law, the evils it was intended to remedy, and the legislative history of the statute."  Ultsch v. Illinois Municipal Retirement Fund, 226 Ill. 2d 169, 181, 874 N.E.2d 1, 8 (2007).

"Where the language of a statute is plain and unambiguous, a court need not consider other interpretive aids."  Ultsch, 226 Ill. 2d at 184, 874 N.E.2d at 10.

Plaintiffs contend the transfer of the funds violates the takings clause of both the Illinois and United States Constitutions because it would be a taking of private monies.  The federal takings clause is found in the fifth amendment and provides the following: "nor shall private property be taken for public use, without just compensation."  U.S. Const., amend. V. This provision is made applicable to the states through the fourteenth amendment (U.S. Const., amend. XIV).  Southwestern Illinois Development Authority v. National City Environmental, L.L.C., 199 Ill. 2d 225, 235, 768 N.E.2d 1, 7 (2002).  The Illinois takings clause is found in article I, section 15, of the Illinois Constitution and provides: "Private property shall not be taken or damaged for public use without just compensation as provided by law."  Ill. Const. 1970, art. I, §15.

Plaintiffs argue Thompson v. Kentucky Reinsurance Ass'n, 710 S.W.2d 854 (Ky. 1986), has "startlingly" similar facts and is therefore persuasive.  In Thompson, the issue on appeal was whether Kentucky's General Assembly could divert funds from the Kentucky Reinsurance Association (KRA), a statutorily created Kentucky nonprofit corporation, which operated entirely on premiums collected from Kentucky insurance carriers licensed to write workers compensation insurance, Kentucky self-insurance groups, and Kentucky self-insured employers.  Thompson, 710

S.W.2d at 855. Kentucky's legislature attempted to transfer the premiums paid to the KRA into the state's general revenue fund. Thompson, 710 S.W.2d at 857. Kentucky's supreme court found the legislature did not have this power because the funds were "clearly private funds." (Emphasis omitted.) Thompson, 710 S.W.2d at 857. The fund from which the Kentucky legislature attempted to transfer money received its income solely "from premiums charged its subscribers-insurance carriers, self-insurance groups, and self-insured employees." Thompson, 710 S.W.2d at 857.

Plaintiffs also claim this case is similar to Illinois Clean Energy Community Foundation v. Filan, 392 F.3d 934 (7th Cir. 2004). There, the State argued it could require the trustees of a charitable trust that the Interstate Commerce Commission had required Commonwealth Edison to establish with proceeds from the sale of seven of Commonwealth Edison's power plants to turn over up to $125 million to the State's treasury and environmental agencies upon written demand by the State's budget director. Illinois Clean Energy, 392 F.3d at 936. Even though the state created the trust, it was independent of the State and was funded by private money. Illinois Clean Energy, 392 F.3d at 936-37. Therefore, the State could not confiscate any of the trust's assets. Illinois Clean Energy, 392 F.3d at 938.

However, both Thompson and Illinois Clean Energy are distinguishable from the case sub judice in that the fees collected and placed into the CRST Fund are fees charged by the

State for the privilege of operating a motorcycle. The fees are not received from insurance premiums and held by a separate corporation such as the KRA as in Thompson. Similarly, the monies in the CRST Fund are not from the sale of a private corporation's assets with the proceeds being used, at the State's direction, to create a foundation or trust as in Illinois Clean Energy.

The case here is also different from City of Chicago v. Holland, 206 Ill. 2d 480, 493, 795 N.E.2d 240, 248 (2003), another case cited by plaintiffs, where the funds at issue were primarily generated through federal grants and self-generated revenue through fees paid by airlines, passengers, and tenants of airports. The money in the CRST Fund is collected by the Secretary of State from motorcyclists who are paying for the privilege of operating a motorcycle in Illinois (much like owners of automobiles pay fees to register their cars), held by the State Treasurer, and administered by the Department. See 625 ILCS 35/6 (West 1992).

Defendants argue that while section 6 of the Act authorizes federal money and private donations to be placed in the fund, plaintiffs have actually offered no evidence that any federal or private monies were transferred into the CRST Fund or that the money transferred pursuant to the 2004 and 2005 State Finance Acts were those monies other than the public funds collected by the Secretary of State. In other words, the record reflects no private money or restricted federal funds were

- 12 -

transferred from the CRST Fund to the General Revenue Fund. Section 6 also authorizes the Department to accept State funds to be placed in the CRST Fund. 625 ILCS 35/6 (West 1992). Because no record evidence shows any private monies were transferred from the CRST Fund to the General Revenue Fund, plaintiffs cannot show any private money was taken, an essential element of showing a violation of the takings clause of the Illinois and United States Constitutions.

As stated, plaintiffs also make and, for the sake of argument, we will accept as true, the following arguments: (1) the plain language of the Act shows the legislature created a trust and placed it outside the State Treasury with the intent that no General Revenue Funds could be placed in the trust, (2) the December 1992 amendments show the legislature intended to change the CRST Fund from a special fund inside the State Treasury to a trust fund outside the State Treasury and to deprive the legislature of the power to transfer funds from the CRST Fund into the General Revenue Funds, and (3) the legislative history, including the Governor's veto message and legislative debates, shows the legislature intended to place the CRST funds beyond the power of later legislatures to sweep. However, even accepting these arguments as true, we conclude the legislature had the authority to enact the 2004 and 2005 BIMPs that enabled the transfer of funds from the CRST Fund into the General Revenue Fund.

Both plaintiffs and the dissent would have us apply the

general rules of trusts to the CRST Fund created by the Act and hold that the legislature was without the power to transfer funds from the CRST Fund to the General Revenue Fund.  Illinois, like most jurisdictions, follows the general rule that "a settlor cannot modify or revoke a trust unless he has reserved the power to do so in the trust agreement."  Williams v. Springfield Marine Bank, 131 Ill. App. 3d 417, 419, 475 N.E.2d 1122, 1124 (1985).  Here, the General Assembly did not reserve to itself in the Act the power to revoke or modify the terms of the trust when it created the trust.  While we have been unable to find any Illinois case law addressing whether the general rules of trusts apply to the legislature in circumstances similar to those present in the case sub judice, at least two courts from other jurisdictions have refused to apply the general principle that a settlor does not have the power to revoke or modify the terms of a trust unless they explicitly reserved that power to the legislature.  See Barber v. Ritter, 196 P.3d 238, 253-54 (Colo. 2008) (where the Colorado Supreme Court recognized the legislature did not reserve the right to modify or revoke the terms of the statute creating the trust but concluded the legislature had the power to do so to allow the transfer of funds from the trust fund into the general revenue fund); Board of Trustees of the Tobacco Use Prevention & Control Foundation v. Boyce, Nos. 09AP-768, 09AP-769, 09AP-785, 09AP-786, 09AP-832, 09AP-833 cons.  (Ohio App. December 31, 2009) (where the court refused to apply the general rule and find the legislature created an irrevocable

- 14 -

trust because a legislature has no power to bind future legislatures).

In <u>Barber</u>, the petitioners argued that three funds from which monies were transferred into the general revenue fund were public trusts and the transfer of monies from those funds into the general revenue fund constituted a misappropriation of the trust corpus. <u>Barber</u>, 196 P.3d at 252-53. The Colorado Supreme Court accepted for the sake of argument, without deciding, that the three funds were public trusts. <u>Barber</u>, 196 P.3d at 253.

The <u>Barber</u> court stated that the petitioners' argument turned on the implicit premise that the Colorado General Assembly lacked the authority to alter or amend the statutes creating the trusts. <u>Barber</u>, 196 P.3d at 253. Therefore, the amendments providing for the transfer were ineffective and "constituted a misappropriation of the trust corpus." <u>Barber</u>, 196 P.3d at 253. Specifically, the petitioners argued "the General Assembly's lack of power to amend the statutes in question arises from the special status of the funds created by those statutes as trusts." <u>Barber</u>, 196 P.3d at 253.

The court noted that Colorado follows the view that once a trust is created it cannot be revoked by the settlor without all of the beneficiaries' consent unless the settlor explicitly reserved the power to do so unilaterally. <u>Barber</u>, 196 P.3d at 253. However, the court concluded the legislature could not limit its absolute power to appropriate funds by creating an irrevocable public trust:

"None of the statutes creating the funds explicitly reserve to the General Assembly the power as settlor to revoke or amend them. However, we have repeatedly recognized that the General Assembly's power over appropriations is constitutionally derived and have characterized this power as 'absolute' and 'plenary.' [Citation.] *** To hold that the General Assembly could limit this plenary power to appropriate by creating an irrevocable public trust would be to effectively hold that the General Assembly could abrogate its constitutional powers by statute. This is not the law. *** We therefore decline to read the cash funds' enabling legislation as creating irrevocable trusts that would unconstitutionally restrain the legislature's plenary power over appropriations.

The status of the three cash funds as public trusts does not, and constitutionally cannot, have any limiting effect on the legislature's plenary power to amend or repeal those funds' enabling statutes. The legislature's amendment of the cash funds' enabling statutes to allow for the transfer of funds to the General Fund did not, therefore, con-

stitute a misappropriation of the trust corpus, and did not trigger a fiduciary obligation to repay the transferred monies. Thus, we hold that, even if the cash funds are public trusts, they are not irrevocable trusts, and the legislature has the authority to amend them to allow for the transfer of monies to the General Fund." (Emphasis in original.) Barber, 196 P.3d at 253-54.

Similarly, an Ohio appellate court (Boyce, slip op. at 9) followed the reasoning of Barber and upheld the transfer of money from an endowment fund (admittedly classified as state funds) into the general fund. In doing so, the Boyce court recognized the principle that one General Assembly cannot bind successive legislatures is a constitutional principle "derived from the General Assembly's plenary power to legislate as to any matter, except as limited by the state and federal [c]onstitutions." Boyce, slip op. at 20.

It is "well accepted in [Illinois] that the constitution is not regarded as a grant of powers to the legislature but is a limitation upon its authority; the legislature may enact any legislation not expressly prohibited by the constitution." People ex rel. Chicago Bar Ass'n v. State Board of Elections, 136 Ill. 2d 513, 525, 558 N.E.2d 89, 94 (1990). As stated, plaintiffs have not shown a taking of private funds prohibited by either the Illinois or federal constitution and we have found no

other constitutional provision prohibiting the transfers.

Additionally, Illinois courts have stated that "[t]he legislature is *** the sole and exclusive authority for the appropriation of the funds of the state." Galpin v. City of Chicago, 159 Ill. App. 135, 153 (1910). Moreover, "[t]he transfer of money accumulated in one fund into a general revenue fund is generally within the province and authority of the legislature." Terra-Nova Investments v. Rosewell, 235 Ill. App. 3d 330, 340, 601 N.E.2d 1109, 1117 (1992); see also Valstad v. Cipriano, 357 Ill. App. 3d 905, 917-18, 828 N.E.2d 854, 868 (2005). Further, the actions of one legislature cannot bind future legislatures. See Polich v. Chicago School Finance Authority, 79 Ill. 2d 188, 200-01, 402 N.E.2d 247, 252 (1980); see also Choose Life Illinois, Inc. v. White, 547 F.3d 853, 858 n.4 (7th Cir. 2008) ("It is axiomatic that one legislature cannot bind a future legislature"). As shown, Illinois follows the same principles the Barber and Boyce courts used to come to their respective decisions that their state's respective legislatures had the power to amend the statutes in question to allow for the transfer of funds held in a trust created by the legislature, even though that power was not explicitly reserved in the statutes creating those trusts, into the General Revenue Fund. We adopt the Barber and Boyce courts' reasoning and conclude the Illinois legislature, by enacting the 1992 amendments to the Act, did not create an irrevocable trust and therefore had the authority to transfer funds from the CRST Fund into the General Revenue Fund via the

- 18 -

2004 and 2005 BIMPs.

Because of our conclusion, we must look to what the later Public Acts 93-32 and 93-839 accomplished.  The 2004 BIMP specifically authorized the interfund transfer at issue here as the CRST Fund is one of the funds listed from which the legislature authorized money to be transferred to the General Revenue Fund.  30 ILCS 105/8.42 (West 2004).  Also of note, section 8.42 states, "All such transfers shall be made on July 1, 2003, or as soon thereafter as practical.  These transfers may be made <u>notwithstanding</u> any other provision of law to the contrary." (Emphasis added.)  30 ILCS 105/8.42 (West 2004).

This language shows the legislature's intent to authorize these transfers in a time of our state's fiscal crisis in spite of any statute previously in existence that states otherwise.  Moreover, section 8h of the State Finance Act authorized the Director of the Bureau of the Budget to order the State Treasurer and State Comptroller to transfer a specified fund from <u>any</u> <u>fund held</u> <u>by</u> <u>the</u> <u>State</u> <u>Treasurer</u>.  The CRST Fund is held by the State Treasurer (see 625 ILCS 35/6 (West 1992) ("Secretary of State will hereafter deposit in the State Treasury")).  Further, if the legislature had intended to exempt the CRST Fund from these transfers, the legislature could have done so explicitly as it did with restricted federal funds, the Motor Fuel Tax Fund, the Criminal Justice Information Systems Trust Fund, and other funds listed.  See Pub. Act 93-32, §50-5, eff. June 20, 2003 (2003 Ill. Legis. Serv. 400, 401-02 (West)); Pub. Act 93-839,

- 19 -

§10-100, eff. July 30, 2004 (2004 Ill. Legis. Serv. 1381, 1402-04 (West)). These legislative enactments show the 93rd General Assembly intended to authorize the transfer of CRST Fund monies into the General Revenue Fund.

### III. CONCLUSION

For the reasons stated, the 2004 and 2005 BIMPs are constitutional and enforceable. Therefore, we affirm the trial court's judgment.

Affirmed.

POPE, J., concurs.

APPLETON, J., dissents.

JUSTICE APPLETON, dissenting:

I respectfully dissent from the majority's decision. By the 1992 amendment to section 6 (625 ILCS 35/6 (West 1992)), the legislature declared an express trust. Illinois residents 16 years of age or older with a valid driver's license have a beneficial interest in the "trust fund." That beneficial interest is property, which the State cannot take without violating the takings clause of the Illinois Constitution (Ill. Const. 1970, art. I, §15). The budget-implementation plans are unconstitutional insomuch as they take amounts already deposited in the trust fund and transfer those amounts to the General Revenue Fund.

## A. An Express Trust

### 1. The Capacity of the State To Create a Trust

"[T]he General Assembly is free to enact any legislation that the constitution does not expressly prohibit." Maddux v. Blagojevich, 233 Ill. 2d 508, 522, 911 N.E.2d 979, 988 (2009); see also Locust Grove Cemetery Ass'n v. Rose, 16 Ill. 2d 132, 138, 156 N.E.2d 577, 580 (1959) ("Every subject within the scope of civil government which is not within some constitutional inhibition may be acted upon by the General Assembly"). I am aware of no constitutional provision expressly prohibiting the General Assembly from enacting legislation making the State of Illinois the settlor of a trust. I do not doubt that the General Assembly has the power to grant property outright, such as by awarding grants out of public funds. It follows that the General

- 21 -

Assembly also has the power to transfer public funds in trust. "A person has capacity to create a trust by transferring property inter vivos in trust to the extent that he has capacity to transfer the property inter vivos free of trust." Restatement (Second) of Trusts §19, at 64 (1959).

Several treatises on the law of trusts recognize that a state can be a trustee. (They also add that sovereign immunity might prevent a beneficiary from enforcing the trust. Sovereign immunity does not prevent us, however, from assessing the constitutionality of a statute.) 2 A. Scott, M. Ascher & W. Fratcher, Scott & Ascher on Trusts §11.1.5, at 607-08 (5th ed. 2006); G. Bogert & G. Bogert, Trusts & Trustees §128, at 393 (1984); Restatement (Second) of Trusts §95, at 221-22 (1959). If, in the view of these authorities, a state can take property in trust, a state can transfer property in trust to one of its agencies. I conclude that the General Assembly has the inherent power to make the State of Illinois the settlor of a trust and to appoint a state agency as the trustee.

2. Requirements for the Creation of an Express Trust

The supreme court has held there are six requirements for the creation of an express trust:

> "(1) [the] intent of the parties to create a trust, which may be shown by a declaration of trust by the settlor or by circumstances which show that the settlor intended to create a trust; (2) a definite subject matter or

- 22 -

trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee." <u>Eychaner v. Gross</u>, 202 Ill. 2d 228, 253, 779 N.E.2d 1115, 1131 (2002).

I find the fulfillment of each of those requirements in this case.

a. A Declaration of Trust by the Settlor

In section 6 of the State Finance Act (625 ILCS 35/6 (West 2004)), the General Assembly makes "a declaration of trust." <u>Eychaner</u>, 202 Ill. 2d at 253, 779 N.E.2d at 1131. To finance a training program for motorcycle riders, the General Assembly requires the Secretary of State to "deposit with the State Treasurer an amount equal to each annual fee and \*\*\* reduced fee[] for the registration of each motorcycle, motor driven cycle[,] and motorized pedalcycle processed by the Office of the Secretary of State during the preceding quarter \*\*\*, which amount the State Comptroller shall transfer quarterly to a <u>trust fund</u> outside of the State treasury[,] to be known as the [']Cycle Rider Safety Training Fund,['] which is hereby created." (Emphasis added.) 625 ILCS 35/6 (West 2004).

The mere use of the word "trust" does not establish the existence of an express trust. <u>La Throp v. Bell Federal Savings & Loan Ass'n</u>, 68 Ill. 2d 375, 381, 370 N.E.2d 188, 191 (1977).

(Again, six requirements must be met.  <u>Eychaner</u>, 202 Ill. 2d at 253, 779 N.E.2d at 1131.)  Nevertheless, I consider the legislature's use of the term "trust fund" to be compelling evidence that it intended to create a trust.  See <u>Oglesby v. Springfield Marine Bank</u>, 395 Ill. 37, 49, 69 N.E.2d 269, 276 (1946) ("Ordinarily, where an express private trust is relied on, the instruments introduced in evidence to establish such trust contain words such as 'in trust'").  I must assume the legislature did not use that term lightly or in ignorance.

### b. Definite Subject Matter or Trust Property

The subject matter of the trust is definite:  the amounts deposited in the trust fund.  These amounts are to be "equal to each annual fee and *** reduced fee[] for the registration of each motorcycle, motor driven cycle[,] and motorized pedalcycle."  625 ILCS 35/6 (West 2004).

### c. Ascertainable Beneficiaries

The beneficiaries are ascertainable:  "all residents of the State who hold a currently valid driver's license and who have reached their 16th birthday."  625 ILCS 35/4 (West 2004).  These are beneficiaries "'capable of taking, and so defined and pointed out, that the trust will not be void for uncertainty.'"  <u>Kingsley v. Montrose Cemetery Co.</u>, 304 Ill. App. 273, 284, 26 N.E.2d 613, 618 (1940), quoting <u>Gallego's Executors v. Attorney General</u>, 30 Va. 450, 466 (1832).  "It is not essential to the validity of a deed of trust that the beneficiaries should appear therein by name.  It will be sufficient if they are so described

- 24 -

or designated that they may be ascertained and distinguished." First National Bank of Elgin v. Schween, 127 Ill. 573, 580, 20 N.E. 681, 685 (1889). I am aware of no authority forbidding the establishment of a trust with numerous beneficiaries. The beneficiaries in this case, though numerous, are definite and ascertainable.

### d. A Trustee

The Department of Transportation is the trustee of the trust fund. The Act does not call the Department the "trustee," but the use or nonuse of that word is not controlling. See La Throp, 68 Ill. 2d at 381, 370 N.E.2d at 191; Restatement (Second) of Trusts §24(2), at 67 (1959). Through its description of the Department's powers and duties with respect to the trust fund, the Act appoints the Department as trustee.

The Department has "the power, duty[,] and authority to administer [the] Act" (625 ILCS 35/3 (West 2004)), and administering the Act ultimately comes down to deciding specifically how the trust fund will be spent (consistently with the provisions setting forth the purpose of the trust and the manner of performance). The Department may promulgate rules and regulations for the administration of the Act. 625 ILCS 35/5 (West 2004). The Department shall designate the state colleges, community colleges, state universities, and community agencies that may organize "Training Centers," in which "cycle rider safety training courses" will be taught. 625 ILCS 35/4 (West 2004). "The Department is authorized to and shall award contracts out of

- 25 -

appropriations to the Department from 'The Cycle Rider Safety Training Fund' to qualifying Regional Cycle Rider Safety Training Centers for the conduct of approved Cycle Rider Safety Training courses."  625 ILCS 35/7 (West 2004).  By rule and regulation, the Department shall prescribe the curriculum and accreditation for these courses, along with the qualifications and certification requirements for the instructors.  625 ILCS 35/4 (West 2004).  The Department shall accept moneys for deposit into the trust fund, which it shall use "for the expenses of the Department in administering the provisions of [the] Act, for funding of contracts with approved Regional Cycle Rider Safety Training Centers for the conduct of courses, or for any purpose related or incident thereto and connected therewith."  625 ILCS 35/6 (West 2004).  These are just the sort of tasks one would expect a trustee to perform in administering the trust fund.

### e. Specification of the Trust Purposes and How the Trust Is To Be Performed

#### i. The <u>Trust</u> <u>Purpose</u>

The trust purpose is to provide "courses of instruction in the use and operation of cycles, including instruction in the safe on-road operation of cycles, the rules of the road[,] and the laws of this State relating to motor vehicles."  625 ILCS 35/2.03 (West 2004).  These courses are open to all Illinois residents 16 years of age or older who possess a valid driver's license.  625 ILCS 35/4 (West 2004).

#### ii. <u>How</u> <u>the</u> <u>Trust</u> <u>Is</u> <u>To</u> <u>Be</u> <u>Performed</u>

By describing the trustee's powers and duties, the Act

- 26 -

describes how the trust is to be performed.  Generally, the manner of performance is as follows.  The Department will approve the organization of regional training centers, which will offer courses on motorcycle safety.  625 ILCS 35/4 (West 2004).  The Department will enter into contracts with these training centers and, by disbursements from the trust fund, pay for their services to trainees.  625 ILCS 35/7 (West 2004).  By publishing rules and regulations, the Department will fill in certain details, such as the curriculum and accreditation for the courses and the qualifications and certification of instructors.  625 ILCS 35/4 (West 2004).  A trust instrument need not specify all the details of administration, so long as it describes, in general terms, the manner in which the trust is to be performed.  In re Estate of Zukerman, 218 Ill. App. 3d 325, 330, 578 N.E.2d 248, 252 (1991).

f. Delivery of the Trust Property to the Trustee

The State has delivered trust property to the Department, as trustee, by depositing amounts in the trust fund.

B. A Taking

"Private property shall not be taken *** for public use without just compensation as provided by law."  Ill. Const. 1970, art. I, §15.  The budget implementation plans violate the takings clause insomuch as they transfer amounts from the trust fund to the General Revenue Fund, for, in so doing, they take what does not belong to the State of Illinois:  the beneficial interest in the trust fund.

Plaintiffs characterize the corpus of the trust as

- 27 -

"private funds," and defendants characterize it as "public funds."  Neither term is apt.  Whenever the Comptroller deposits an amount of money into the trust fund, the ownership of that money divides in two:  the Department of Transportation, as trustee, receives the legal title, and the beneficiaries receive the equitable estate.  See <u>Randolph v. Wilkinson</u>, 294 Ill. 508, 515, 128 N.E. 525, 529 (1920); 35 Ill. L. & Prac. <u>Trusts</u> §59, at 111 (2001).  The equitable estate is property (<u>Merchants' Loan & Trust Co. v. Patterson</u>, 308 Ill. 519, 530, 139 N.E. 912, 916 (1923)), and the State cannot take it any more than it could take the car parked in someone's driveway.

　　The trust fund in this case is an educational trust fund, and, essentially, it is no different from the educational trust fund an uncle might establish for a nephew, with himself as trustee.  If he and his nephew have a falling out, he cannot remove the money from the trust account and put it back in his private account.  That would be conversion (or, in the State's case, an uncompensated taking).  He can stop depositing money into the trust account (just as the General Assembly, if it wished, could repeal the provision in section 6 (625 ILCS 35/6 (West 2004)) whereby registration fees are deposited every quarter into the trust fund).  But once he deposits a sum into the trust account, he loses the equitable title to it and retains only the legal title.