# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

*A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611

---

Caption in Supreme
Court:

A.B.A.T.E. OF ILLINOIS, INC., *et al.*, Appellants, v. PATRICK
QUINN, Governor of Illinois, *et al.*, Appellees.

Docket No.          110611

Filed               October 27, 2011

Held

(*Note: This syllabus
constitutes no part of
the opinion of the court
but has been prepared
by the Reporter of
Decisions for the
convenience of the
reader.*)

Where motorcycle registration fees funded a safety training program and
were legislatively designated for placement in a "trust fund outside of the
State Treasury," with no reference to trust revocability, the plenary
authority of a subsequent legislature permitted it to transfer the money to
the General Revenue Fund, and there was no unconstitutional taking
where there was no indication that the funds were private.

Decision Under
Review

Appeal from the Appellate Court for the Fourth District; heard in that
court on appeal from the Circuit Court of Sangamon County, the Hon.
Leo Zappa, Judge, presiding.

Judgment            Appellate court judgment affirmed.

Counsel on
Appeal

George W. Tinkham, of Springfield, and Rodney V. Taylor, of Christopher & Taylor, of Indianapolis, Indiana, for appellants.

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Paul Berks, Assistant Attorney General, of Chicago, of counsel), for appellees.

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, Garman, Karmeier, and Theis concurred in the judgment and opinion.

Chief Justice Kilbride dissented, with opinion.

**OPINION**

¶ 1    Effective January 1, 1993, the legislature amended the Cycle Rider Safety Training Act (the Act) (625 ILCS 35/1 *et seq.* (West 1994)). Among other things, this amendment changed the Cycle Rider Safety Training Fund (CRSTF) from a special fund inside the state treasury to a "trust fund outside of the State treasury." 625 ILCS 35/6 (West 1994). In this appeal we are asked to determine what effect this amendment has on the legislature's authority to order the transfer of funds out of the CRSTF and into the General Revenue Fund (GRF); whether the transfer of funds out of the CRSTF amounts to an unconstitutional "taking" of private property without just compensation; and whether, in order to transfer funds out of the CRSTF, the legislature must first amend the CRST Act.

¶ 2    The appellate court held that the removal of funds from the CRSTF was not an unconstitutional taking and that the legislature has the authority to order a transfer of funds out of the CRSTF and into the GRF. 401 Ill. App. 3d 326. We now affirm the judgment of the appellate court.

¶ 3                                    BACKGROUND

¶ 4    On January 1, 1982, the Cycle Rider Safety Training Act came into effect. The stated purpose of the Act is "to promote safety for persons and property connected with the use and operation of motorcycles, motor driven cycles and motorized pedalcycles." Ill. Rev. Stat. 1983, ch. 95½, ¶ 801 (now 625 ILCS 35/1). The CRSTF was created in section 6, which initially provided as follows:

> "§ 6. To finance the Cycle Rider Safety Training program and to pay the costs thereof, the Secretary of State will hereafter deposit in the State Treasury an amount equal to $4.00 for each Annual Fee, and $2.00 for each Reduced Fee, for the registration of each motorcycle, motor driven cycle and motorized pedalcycle

processed by the Office of the Secretary of State during the preceding quarter, which amount the State Comptroller shall transfer quarterly to a special fund to be known as 'The Cycle Rider Safety Training Fund', which is hereby created and which shall be administered by the Department. Appropriations from the 'Cycle Rider Safety Training Fund' shall be made by the General Assembly only to the Department, and shall only be used for the expenses of the Department in administering the provisions of this Act, for funding of contracts with approved Regional Cycle Rider Safety Training Centers for the conduct of courses, or for any purpose related or incident thereto and connected therewith. Whenever the total of the amount currently in the Cycle Rider Safety Training Fund and current grants to the Department from the federal government for cycle rider safety training in Illinois exceed $1,200,000, the Department will notify the Governor and the Governor may notify the State Comptroller and State Treasurer of the amount to be transferred from the Cycle Rider Safety Fund to the Illinois Road Fund so that said total approximately equals $1,200,000, and, upon receipt of such notification, the State Comptroller shall transfer such amount to the Illinois Road Fund." Ill. Rev. Stat. 1983, ch. 95½, ¶ 806.

¶ 5        The Act was amended in January 1992 through Public Act 87-838, entitled "Emergency Budget Act of Fiscal Year 1992." This amendment added the following language to the end of section 6:

"In addition to any other permitted use of moneys in the Fund, and notwithstanding any restriction on the use of the Fund, moneys in the Cycle Rider Safety Training Fund may be transferred to the General Revenue Fund as authorized by this amendatory Act of 1992. The General Assembly finds that an excess of moneys exists in the Fund. On February 1, 1992, the Comptroller shall order transferred and the Treasurer shall transfer $200,000 (or such lesser amount as may be on deposit in the Fund and unexpended and unobligated on that date) from the Fund to the General Revenue Fund." Ill. Rev. Stat. 1991, ch. 95½, ¶ 806.

¶ 6        Later that same year, in December 1992, the legislature passed Public Act 87-1217 over the Governor's veto. With this legislation, section 6 was amended effective January 1, 1993, to provide as follows:

"To finance the Cycle Rider Safety Training program and to pay the costs thereof, the Secretary of State will hereafter deposit with the State Treasurer an amount equal to each annual fee and each reduced fee, for the registration of each motorcycle, motor driven cycle and motorized pedalcycle processed by the Office of the Secretary of State during the preceding quarter as required in subsection (d) of Section 2-119 of the Illinois Vehicle Code [625 ILCS 5/2-119[1]], which amount the State Comptroller

---

[1]At the time of this amendment, paragraph (d) of section 2-119 of the Illinois Vehicle Code (625 ILCS 5/2-119(d) (West 1994)) provided as follows:

"Beginning January 1, 1992 and until January 1, 1994, of the monies collected as a registration fee for each motorcycle, motor driven cycle and motorized pedalcycle, $7 of each annual registration fee for such vehicle and $3.50

shall transfer quarterly to a trust fund outside of the State treasury to be known as the Cycle Rider Safety Training Fund, which is hereby created. In addition, the Department may accept any federal, State, or private moneys for deposit into the Fund and shall be used by the Department only for the expenses of the Department in administering the provisions of this Act, for funding of contracts with approved Regional Cycle Rider Safety Training Centers for the conduct of courses, or for any purpose related or incident thereto and connected therewith." 625 ILCS 35/6 (West 1994).

¶ 7    In addition to making the CRSTF a "trust fund outside of the State treasury," the amended statute struck the provision which previously permitted the regular transfer of monies out of the CRSTF and into the Road Fund. It also struck the provision added by the January 1992 amendment which permitted a sweep of $200,000 into the General Revenue Fund in February 1992.

¶ 8    The statute has not been substantively amended since the December 1992 amendment. However, without amending the CRST Act, the legislature authorized the transfer of monies from the CRSTF (and numerous other funds) into the GRF with its enactment of Public Act 93-32, the Budget Implementation Act for fiscal year 2004 (the FY2004 BIMP). To accomplish this, the FY2004 BIMP (which became effective June 20, 2003), amended the State Finance Act (30 ILCS 105/1 *et seq.* (West 2002)), by creating sections 8.42 and 8h. The newly created section 8.42 of the State Finance Act provided in pertinent part:

"In order to address the fiscal emergency resulting from shortfalls in revenue, the following transfers are authorized from the designated funds into the General Revenue Fund:

* * *

Cycle Rider Safety Training Fund ......... $ 1,000,000.

* * *

All such transfers shall be made on July 1, 2003, or as soon thereafter as practical. These transfers may be made notwithstanding any other provision of law

---

of each semiannual registration fee for such vehicle is deposited in the Cycle Rider Safety Training Fund.

Beginning January 1, 1994, of the monies collected as a registration fee for each motorcycle, motor driven cycle and motorized pedalcycle, $8 of each annual registration fee for such vehicle and $4 of each semiannual registration fee for such vehicle is deposited in the Cycle Rider Safety Training Fund."

This paragraph was later amended by Public Act 90-622, as follows:

"(d) Beginning January 1, 1999, of the monies collected as a registration fee for each motorcycle, motor driven cycle and motorized pedalcycle, 27% of each annual registration fee for such vehicle and 27% of each semiannual registration fee for such vehicle is deposited in the Cycle Rider Safety Training Fund." 625 ILCS 5/2-119(d) (West 1998).

Paragraph (d) of section 2-119 has not been amended since Public Act 90-622.

to the contrary." 30 ILCS 105/8.42 (West Supp. 2003).

¶ 9 The newly created section 8h of the State Finance Act provided:

"Notwithstanding any other State law to the contrary, the Director of the Bureau of the Budget may from time to time direct the State Treasurer and Comptroller to transfer a specified sum from any fund held by the State Treasurer to the General Revenue Fund in order to help defray the State's operating costs for the fiscal year." Pub. Act 93-32 (eff. June 20, 2003) (adding 30 ILCS 105/8h).

¶ 10 Subsequently, the legislature enacted Public Act 93-839, the Budget Implementation Act for fiscal year 2005 (the FY2005 BIMP), which became effective July 30, 2004. The FY2005 BIMP, among other things, rewrote section 8h of the State Finance Act to provide as follows:

"[N]otwithstanding any other State law to the contrary, the Governor may, *through June 30, 2007,* from time to time direct the State Treasurer and Comptroller to transfer a specified sum from any fund held by the State Treasurer to the General Revenue Fund in order to help defray the State's operating costs for the fiscal year." (Emphasis added.) 30 ILCS 105/8h (West 2004).

¶ 11 In June 2006, then-Governor Blagojevich issued a number of fund transfer notifications directing the transfer of money from several special funds into the General Revenue Fund. One such fund transfer notification ordered the transfer of $296,000 from the CRSTF into the General Revenue Fund pursuant to "Public Act 93-0032 (30 ILCS 105/8h Sec. 8h)" and the "authorization set forth in amendments to 30 ILCS 105/8h in P.A. 93-839."

¶ 12 On June 9, 2006, A.B.A.T.E. of Illinois, Inc., and K. Gene Beenega (plaintiffs) sought a temporary restraining order to prevent transfers out of certain special funds from taking place in accordance with the fund transfer notifications that the Governor had issued. The trial court entered a temporary restraining order on June 9, 2006.

¶ 13 Thereafter, on June 12, 2006, plaintiffs filed a motion for preliminary injunction, as well as a putative class action complaint against Patrick Quinn, Daniel W. Hynes, and Alexi Giannoulias, in their official capacities as Governor, Comptroller and Treasurer, respectively. Plaintiffs sought declaratory judgment, permanent injunction, and *mandamus*, contending that the transfer of funds out of the CRSTF and other trust and/or special dedicated funds, pursuant to Public Acts 93-32, and 93-839, and "all other state governmental actions removing money from Trust/Special Dedicated Funds and transferring it into the General Revenue Fund," violated the prohibition of amendment by reference, revenue, takings, uniformity, equal protection, due process, and contracts clauses of the Illinois Constitution, as well as the takings, equal protection, due process and contracts clauses of the United States Constitution. As a remedy, plaintiffs sought the return of monies already transferred from certain identified funds, including the CRSTF, as well as an injunction to bar defendants from transferring any additional monies out of the identified funds.[2]

---

[2]Plaintiffs alleged, and it is uncontested, that pursuant to Public Acts 93-32 and 93-839 over $1.2 million was transferred out of the CRSTF and into the General Revenue Fund. According to the Illinois Comptroller's website, as of August 11, 2011, the cash balance in the Cycle Rider Safety Training Fund is $10,775,695.46.

¶ 14    In an order dated July 28, 2006, the circuit court of Sangamon County denied plaintiffs' motion for a preliminary injunction. Thereafter, defendants moved for the dismissal of plaintiffs' complaint. On November 15, 2006, the trial court granted defendants' motion, dismissing all counts except for those regarding the CRSTF. Subsequently, on April 30, 2008, defendants moved for summary judgment on the remaining claims, arguing that the legislative actions authorizing the transfer of monies from the CRSTF to the GRF were constitutional and all of plaintiffs' arguments to the contrary were without merit. Plaintiffs filed a cross-motion for summary judgment on August 12, 2008, and on October 23, 2008, the trial court denied plaintiffs' motion and granted defendants' motion, upholding the constitutionality of the BIMPs. Plaintiffs appealed.

¶ 15    The appellate court affirmed the lower court's grant of summary judgment to the defendants. 401 Ill. App. 3d 326. While assuming that the CRSTF was a trust, the appellate court found that it was not irrevocable and, therefore, rejected plaintiffs' claim that the Ninety-third General Assembly did not have authority to transfer monies from the CRSTF into the General Revenue Fund. The appellate court also found that the funds in the CRSTF were not private and, thus, rejected plaintiffs' only remaining constitutional claim, *i.e.*, that the transfer of monies out of the CRSTF was a "taking" of private property in violation of the takings clause of the Illinois and United States Constitutions.

¶ 16    One appellate justice dissented, finding that, because the CRSTF is a trust, once monies are deposited into the CRSTF, the beneficial interest in the *res* of the trust belongs to the trust beneficiaries. Thus, the dissenting justice agreed with plaintiffs that any sweep of funds out of the CRSTF and into the GRF constituted an unconstitutional taking.

¶ 17    Plaintiffs petitioned for leave to appeal in this court, which we granted. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 18                                    ANALYSIS

¶ 19    In this appeal we are asked to decide whether the FY2004 and FY2005 BIMPs were unconstitutional to the extent that they authorized the sweep of funds out of the Cycle Riders Safety Training Fund and into the General Revenue Fund. In order to decide this issue, we must construe section 6 of the Cycle Rider Safety Training Act and decide whether, as plaintiffs contend, the Eighty-seventh General Assembly took away the authority of all future legislatures to transfer funds out of the CRSTF when it amended section 6, making the CRSTF a "trust fund outside of the State treasury."

¶ 20    At the outset, we note that neither plaintiffs, nor defendants, have directed our attention to any Illinois case law which has interpreted the meaning of legislation which designates a special fund as a "trust fund outside of the State treasury." Also, our own research has been unsuccessful in uncovering any Illinois case law which sheds any light on the issue before us. Thus, the issue is one of first impression for this court.

¶ 21                               Standard of Review

¶ 22    Like the appellate court below, we review the trial court's order granting summary

judgment in favor of defendants. Accordingly, we are presented with a question of law and the *de novo* standard of review applies. *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 309 (2010) (summary judgment orders are reviewed *de novo*). As our Code of Civil Procedure provides, summary judgment is proper where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). Further, this court has held that when parties file cross-motions for summary judgment, they indicate their mutual agreement that only a question of law is involved and, thus, invite the court to decide the issues based on the record. *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d at 309.

¶ 23    The *de novo* standard of review is also dictated by the fact that the issue before us involves the construction of a statute. See *Ries v. City of Chicago*, 242 Ill. 2d 205 (2011).

¶ 24                            The Nature of the CRSTF

¶ 25    It has long been recognized that the legislature has the authority to order monies collected in one fund be transferred into a different fund. See *Department of Public Welfare v. Haas*, 15 Ill. 2d 204, 215 (1958) ("The fact that the legislature may provide that amounts, when collected, shall be placed in a certain fund does not ordinarily preclude a later General Assembly from ordering it paid into another fund or from abolishing the fund altogether."); see also *Valstad v. Cipriano*, 357 Ill. App. 3d 905, 917-18 (2005) (the transfer of money accumulated in special funds into a general revenue fund is generally within the legislature's province and authority); *Terra-Nova Investments v. Rosewell*, 235 Ill. App. 3d 330, 340 (1992) (same). While plaintiffs do not dispute the legislature's general authority to divert funds for public purposes, they claim that, here, because the legislature made the CRSTF a "trust fund outside of the State treasury," the legislature lacks authority to sweep funds out of the CRSTF and into the GRF.

¶ 26    In support of their claim, plaintiffs first argue that the CRSTF is a trust containing funds which are private, not public. According to plaintiffs, the portion of the registration fees paid by motorcyclists and allocated to the CRSTF is a separate "surcharge" paid over and above the fee for registering and licensing motorcycles. This "surcharge," plaintiffs assert, never enters or passes through the state treasury before being placed into the CRSTF and, for this reason, never becomes "public funds." Plaintiffs liken the "surcharge" paid by motorcyclists to the workers compensation premiums paid by Kentucky insurance carriers, self-insurance groups and self-insured employers in *Thompson v. Kentucky Reinsurance Ass'n*, 710 S.W.2d 854 (Ky. 1986), or the medical malpractice annual assessment paid by health care providers in *Wisconsin Medical Society, Inc. v. Morgan*, 2010 WI 94, 787 N.W.2d 22. Plaintiffs conclude that the monies in the CRSTF are not state funds, but private money held in trust by the state, which is acting as trustee.

¶ 27    Alternatively, plaintiffs argue that, even if the registration and licensing fees are public funds when paid, they become private funds once they enter the CRSTF. This is so, plaintiffs contend, because the Eighty-seventh General Assembly, when it made the CRSTF into "a trust fund outside of the State treasury," intended to make–and succeeded in making–the

CRSTF an irrevocable private trust. Plaintiffs contend that the trust is irrevocable because the Eighty-seventh General Assembly did not reserve the power to confiscate or revoke the trust. Further, because the trust is irrevocable, once the funds are deposited into the CRSTF, the state no longer holds legal title to the trust property and the beneficiaries' interest in the trust property is vested. As a result, plaintiffs assert that the funds in the CRSTF are private, not public, funds.

¶ 28    In either case, plaintiffs conclude that, because the monies in the CRSTF are private funds, any transfer of these funds into the GRF constitutes a "taking" of private property for public purposes without just compensation, in violation of our state and federal constitutions. Ill. Const. 1970, art. I, § 15; U.S. Const., amend. V. As a result, plaintiffs contend that the funds contained in the CRSTF must remain inviolable such that the Ninety-third General Assembly or, indeed, any future General Assembly, is without authority to order the transfer of funds out of the CRSTF and into the GRF. We disagree.

¶ 29    First, plaintiffs wrongly characterize the funds which enter the CRSTF as private money. Although the Act permits federal grant money and private donations to be deposited in the CRSTF (see 625 ILCS 35/6 (West 2010)), plaintiffs do not allege, nor is there any evidence of record to suggest, that monies from these sources ever have been deposited into the CRSTF. Consequently, it is undisputed that all of the monies in the CRSTF have come from the legislative appropriation of a portion of the registration and licensing fees paid to the state by motorcyclists each year for the privilege of operating their motorcycles on the roadways of this state. Contrary to plaintiffs' assertion, this portion of the motorcyclists' registration and licensing fees is not a "surcharge" or some type of special assessment paid by motorcyclists separate and apart from the registration fee. Rather, the money which enters the CRSTF is simply a percentage of the fee collected by the state for the registration and licensing of motorcycles. Clearly, the fee charged by the state for motorcycle registration and licensing is state revenue and, therefore, the portion of this state revenue which the General Assembly has allocated to the CRSTF is also public money. Accordingly, we reject plaintiffs' argument that the monies deposited into the CRSTF are private funds held by the state as trustee.

¶ 30    We also reject plaintiffs' alternative argument that the funds become private once they are deposited into the CRSTF because the state, as settlor, created the CRSTF as an irrevocable private trust. A private trust is one which is created by the settlor for the benefit of the trust's beneficiaries, who must be identified or ascertainable. See Restatement (Second) of Trusts § 1, cmt. c; § 2, cmt. j (1959). It is generally true that the settlor of a private trust must expressly reserve the right of revocation for a trust to be revocable. See Restatement (Second) of Trusts § 330 (1959). However, the Restatement (Second) of Trusts also provides that when a settlor has failed to expressly indicate whether a trust is subject to revocation or amendment, the question is one of interpretation. Restatement (Second) of Trusts § 330 (1959).

¶ 31    Plaintiffs contend that we should interpret the CRSTF as an irrevocable trust because the Eighty-seventh General Assembly, as settlor, did not reserve the right of revocation. In addition, plaintiffs contend that legislative history–including the Governor's veto message and the legislative debates–indicates that it was the legislature's intent that the CRSTF be

-8-

held, irrevocably, beyond the power of future legislatures to sweep.

¶ 32    While it is true that the Eighty-seventh General Assembly did not expressly reserve the right of revocation, it also did not expressly create the CRSTF as an irrevocable trust. In an attempt to discern legislative intent, we have reviewed the legislative debates and find that they do not unequivocally support the notion that the legislature intended to make the CRSTF an irrevocable trust. More importantly, we must reject plaintiffs' assertion that the legislature intended to make the CRSTF an irrevocable trust because finding it to be such would be contrary to settled principles of law and would place an unconstitutional restraint on the legislature's plenary power.

¶ 33    The Illinois General Assembly is a legislative body required by our constitution to make appropriations for all expenditures of public funds. Ill. Const. 1970, art. VIII, § 2. Our constitution provides that "[p]ublic funds, property or credit shall be used only for public purposes." Ill. Const. 1970, art. VIII, § 1. Because we have found that the funds which are deposited into the CRSTF are public funds, the legislature would have violated its constitutional duty if it used these funds to create vested rights in private individuals. See *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 104 (1990) ([A]bsent some clear indication to the contrary, it is presumed that " 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' ") (quoting *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985)).

¶ 34    Further, interpreting the CRSTF as an irrevocable private trust would mean that the Eighty-seventh General Assembly placed an unconstitutional restraint on the legislature's plenary power. In *Choose Life Illinois, Inc. v. White*, 547 F.3d 853 (7th Cir. 2008), it was held "axiomatic" that one legislature cannot bind a future legislature." And in *Village of Rosemont v. Jaffe*, 482 F.3d 926, 937 (7th Cir. 2007), the court held, "[i]t is for each elected legislature to express the will of the people as it sees fit." See also *Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932) ("[T]he will of a particular Congress *** does not impose itself upon those to follow in succeeding years."). The United States Supreme Court, in *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.* described as "elementary" the proposition that the principal function of a legislature is to make laws which establish the policy of the state and that policy is "inherently subject to revision and repeal." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. at 466. To hold otherwise, the Court said, would "limit drastically the essential powers of a legislative body." *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. at 466.

¶ 35    Based on the above, we conclude that the CRSTF is not an irrevocable trust. That being so, the state maintained legal title to the funds placed in the CRSTF. Thus, the public nature of the funds did not change once they were placed in the CRSTF. Since the funds held in the CRSTF remained public funds, the legislature's sweep of monies out of the CRSTF pursuant to the FY2004 and FY2005 BIMPs did not constitute an unconstitutional taking of private property for public purpose.

¶ 36    In reaching this determination, we find persuasive two supreme court opinions from sister states: *Board of Trustees of the Tobacco Use Prevention & Control Foundation v. Boyce*,

2010-Ohio-6207, 941 N.E.2d 745, and *Barber v. Ritter*, 196 P.3d 238 (Colo. 2008) (*en banc*).

¶ 37    *Boyce* involved the Tobacco Use Prevention and Cessation Trust Fund, which the Ohio General Assembly created in 2000. The legislature allocated to this fund $235 million, which came from the proceeds of a master settlement agreement which several states, including Ohio, had entered into with United States tobacco-product manufacturers to resolve litigation for the recovery of health-care expenses incurred by the states as a result of tobacco-related illnesses. After creating the fund, the legislature appropriated the money to an endowment fund, which was to "be in the custody of the treasurer of state but *** not be a part of the state treasury." The money was to be used to pay for programs and research related to tobacco-use prevention and cessation. *Boyce*, 2010-Ohio-6207, ¶ 3, 941 N.E.2d 745. Eight years after the fund was created, the legislature passed new legislation which liquidated the endowment fund and "deposit[ed] the lesser of $40 million or 14.8 percent of the proceeds into the state treasury to the credit of a tobacco-use-prevention fund, and deposit[ed] the remaining proceeds from the liquidation (approximately $190 million) into the state treasury to the credit of a jobs fund." *Id.* ¶ 5. In response to this new legislation, suit was brought by certain former smokers for declaratory relief. The plaintiffs claimed that a trust had been created, which the General Assembly did not have the power to revoke. Plaintiffs sought judgment declaring that (1) the new legislation was unconstitutional under the contract clauses of section 10 of article I of the Constitution of the United States and section 28 of article II of the Ohio Constitution and (2) that the legislation "illegally attempts to appropriate non-treasury funds in breach of an irrevocable trust." *Id.* ¶ 6.

¶ 38    According to the plaintiffs, the money in the endowment fund was not "public funds" because the enabling statute provided that the endowment fund "shall be in the custody of the treasurer of state but shall not be a part of the state treasury." Also, the plaintiffs maintained that, because the fund was outside the state treasury, the legislature intended "to create a trust setting the funds permanently outside the control of future legislation." The Ohio Supreme Court rejected these arguments, stating:

> "Although the General Assembly's plenary legislative power is expansive, it is not all-inclusive. It does not include the ability to bind future General Assemblies. 'No general assembly can guarantee the continuity of its legislation or tie the hands of its successors.' " *Id.* ¶ 16.

Quoting *State ex rel. Fletcher v. Executive Council*, 223 N.W. 737, 740 (Iowa 1929), the Ohio Supreme Court went on to state,

> " '[N]o General Assembly has power to render its enactment irrevocable and unrepealable by a future General Assembly. No General Assembly can guarantee the span of life of its legislation beyond the period of its biennium. The power and responsibility of legislation is always upon the existing General Assembly. One General Assembly may not lay its mandate upon a future one. Only the Constitution can do that. *** The power of a subsequent General Assembly either to acquiesce or to repeal is always existent.' " *Boyce*, 2010-Ohio-6207, ¶ 16, 941 N.E.2d 745.

¶ 39    The second case, *Barber v. Ritter*, 196 P.3d 238 (Colo. 2008) (en banc), is very similar

-10-

to the situation in the case at bar. In *Barber*, the Colorado Supreme Court was asked to consider the constitutionality of certain legislation which the Colorado General Assembly had passed in response to an economic turndown which had caused revenue shortfalls in its general fund. As a remedial measure, the legislature transferred $442 million out of 31 special funds and into the general fund. The Colorado Supreme Court addressed the petitioners' argument that three of the cash funds–the Colorado Children's Trust Fund (Colo. Rev. Stat. § 19-3.5-106 (2008)), the Severance Tax Trust Fund (Colo. Rev. Stat. § 39-29-109 (2008)), and the Unclaimed Property Trust Fund (Colo. Rev. Stat. § 38-13-116.5 (2008))–were public trusts and that the transfer of monies from these cash funds constituted a misappropriation of the trust corpus, triggering an obligation to repay the transferred monies.

¶ 40    The Colorado Supreme Court noted:

"Petitioners argue that the General Assembly's lack of power to amend the statutes in question arises from the special status of the funds created by those statutes as trusts. Colorado follows the view of most jurisdictions that a trust, once created, may not be revoked by the settlor without the consent of all beneficiaries, unless the settlor has explicitly reserved to himself or herself the power to do so unilaterally. [Citations.]

None of the statutes creating the funds explicitly reserve to the General Assembly the power as settlor to revoke or amend them. However, we have repeatedly recognized that the General Assembly's power over appropriations is constitutionally derived and have characterized this power as 'absolute' and 'plenary.' [Citations.] To hold that the General Assembly could limit this plenary power to appropriate by creating an irrevocable public trust would be to effectively hold that the General Assembly could abrogate its constitutional powers by statute. This is not the law. Our constitution requires that amendments thereto be approved by a two-thirds majority of each legislative house and an affirmative majority of the electorate. Colo. Const. art. XIX, § 2. *** We therefore decline to read the cash funds' enabling legislation as creating irrevocable trusts that would unconstitutionally restrain the legislature's plenary power over appropriations." (Emphasis omitted.) *Barber v. Ritter*, 196 P.3d at 253-54.

¶ 41    Like the courts in *Boyce* and *Barber*, we conclude that our legislature cannot create an irrevocable trust with public money. If we were to hold otherwise, it would place an unconstitutional restraint upon the legislature's plenary power. Accordingly, we reject plaintiffs' claim that the money allocated to the CRSTF, once deposited, irrevocably became the property of the beneficiaries of the trust and, therefore, was private money. For that reason, we find no basis for holding that the legislature is without authority to transfer funds out of the CRSTF and into the GRF.

¶ 42                          Necessity of Amending the Act

¶ 43    Plaintiffs' final contention is that, even if the legislature has the authority to remove money from the CRSTF, it may only do so by amending the enabling statute, *i.e.*, the Cycle

Riders Safety Training Act. Again we disagree.

¶ 44     As explained above, we have determined that, to whatever extent the CRSTF is a valid trust, it is not an irrevocable trust. The Restatement (Second) of Trusts provides in comment n of section 330, "Ordinarily a power to revoke the trust will be interpreted as including a power to revoke the trust in part by withdrawing a part of the trust property from the trust." Restatement (Second) of Trusts § 330, cmt. n (1959). There is nothing to indicate that a settlor is required to withdraw funds from a revocable trust in a particular manner or by a particular means.

¶ 45     In the present case, it is clear that the legislature did not want to change the CRSTF, nor did it seek to alter the amount or manner in which funds are allocated to CRSTF. The legislature simply wanted to remove a certain amount of the trust property. We see no reason, therefore, why the legislature cannot pass separate legislation which permits the sweep of funds out of the CRSTF.

¶ 46                           CONCLUSION

¶ 47     We affirm the judgment of the appellate court, which upheld the trial court's grant of summary judgment in favor of defendants, Governor Patrick Quinn, Comptroller Daniel W. Hynes, and Treasurer Alexi Giannoulias.

¶ 48     Appellate court judgment affirmed.

¶ 49     CHIEF JUSTICE KILBRIDE, dissenting:

¶ 50     I respectfully dissent from the majority opinion. I agree with the majority that the registration and license fees are "public" funds. I am concerned, however, that the legislature may have swept private or federal funds from the trust. The legislature's actions in sweeping private or federal funds from the trust would violate both the enabling statute and constitute a "taking."

¶ 51     Based on the record before us, it is unclear whether any moneys swept from the CRSTF comprised federal grants and private donations. It is undisputed that the enabling legislation permits commingling of license and registration fees, private donations, and federal grants. We simply do not know, based on the briefs and record in this case, whether the fund contains any private or federal moneys. I believe this court is making a grave error in declaring that the sweeps were constitutional without additional fact-finding.

¶ 52     The majority cites *Board of Trustees of the Tobacco Use Prevention & Control Foundation v. Boyce*, 2010-Ohio-6207, 941 N.E.2d 745, and *Barber v. Ritter*, 196 P.3d 238 (Colo. 2008) (*en banc*), as persuasive authority. Both of these cases are distinguishable from the instant case. In *Boyce*, the enabling statute created an endowment fund solely for public tobacco settlement money and contained no provisions for federal grants or private donations. Thus, there was no question that the funds at issue contained only money from the tobacco settlement. Similarly, in *Barber*, the funds at issue contained no private donations or federal grant moneys.

-12-

¶ 53     This court has previously held that federal moneys are not Illinois "public funds." See *City of Chicago v. Holland*, 206 Ill. 2d 480, 492-95 (2003). In *Holland*, this court recognized that "the state has no lawful authority to utilize the federal grants for anything other than their intended purposes." *Holland*, 206 Ill. 2d at 494. Obviously, sweeping any federal grant moneys intended for motorcycle rider safety training from the fund to the General Revenue Fund is impermissible.

¶ 54     Although the majority opinion only addresses the CRSTF, the import of today's decision should not be underestimated. There are numerous "trust funds" created by other enabling acts. These "trust funds" include the Renewable Energy Resources Trust Fund, funded from fees imposed on taxpayer electric bills and earmarked for development of renewable energy resources. See 20 ILCS 687/6-4, 6-5 (West 2010). The legislature has swept more than $17 million from this trust fund alone. See 30 ILCS 105/8.42 (West 2004) (interfund transfer of $3 million from the Renewable Energy Resources Trust Fund into the General Revenue Fund); 30 ILCS 105/8.43 (West 2004) (special fund transfer of $9,510,000 from the Renewable Energy Resources Trust Fund into the General Revenue Fund); 30 ILCS 105/8.44 (West 2006) (special fund transfer of $14,033 from the Renewable Energy Resources Trust Fund into the General Revenue Fund); 30 ILCS 105/8.46 (West 2008) (transfer of $5 million from the Renewable Energy Resources Trust Fund to the FY09 Budget Relief Fund).

¶ 55     The legislature has swept $53,000 from the Missing and Exploited Children Trust Fund. See 30 ILCS 105/8.42 (West 2004) (interfund transfer of $53,000 from the Missing and Exploited Children Trust Fund into the General Revenue Fund). The Missing and Exploited Children Trust Fund is comprised of private donations, monetary gifts, grant funds of I-SEARCH Units under the Intergovernmental Missing Child Recovery Act and funding from other private sources and individuals for the purpose of promoting and conducting programs or activities for the prevention or recovery of missing or exploited children. See 30 ILCS 106/6a-5 (West 2010).

¶ 56     The legislature has swept $23,419 from the Continuing Legal Education Trust Fund. See 30 ILCS 105/8.44 (West 2006) (special fund transfer of $23,419 from the Continuing Legal Education Trust Fund into the General Revenue Fund). The Continuing Legal Educational Trust Fund was created under the State's Attorneys Appellate Prosecutor's Act and is allowed to accept gifts or grants of money from any public or private source. See 725 ILCS 210/4.10 (West 2010).

¶ 57     The legislature has also transferred nearly $2 million from the State Parks Fund. See 30 ILCS 105/8.44 (West 2006) (special fund transfer of $1,045,899 from the State Parks Fund to the General Revenue Fund); 30 ILCS 105/8.46 (West 2008) ($250,000 transferred from the State Parks Fund to the FY09 Budget Relief Fund). The State Parks Fund is comprised, at least in part, by Illinois taxpayer charitable donations on Schedule G of the Illinois Department of Revenue tax form. See IL-1040 Schedule G ("Your contribution [to the State Parks Fund] will help preserve and manage state parks throughout Illinois, which are set aside to protect scenic areas and areas of important historic or cultural significance. State parks also offer diverse recreational opportunities such as camping, boating, hunting, fishing and equestrian trails which may not be offered through traditional municipal park systems.")

¶ 58     While sweeps from these and other specific funds are not at issue in this appeal, this court has an obligation to address the implications of sweeping private donations and federal grant moneys from funds earmarked for other purposes.

¶ 59     From a plain reading of the statute, I believe the legislature clearly intended to earmark the registration and license fees to be used only for a specific purpose and created a trust to prevent funds from being used for any other purpose. Certainly, the legislature may amend the Act for future funds, or simply stop allocating future fees to the trust. Even if it is shown that the fund currently contains no private or federal monies, I believe the best approach is to require the legislature to amend the enabling act and then allow restricted sweeps of public funds, excluding sweeps of private donations and federal grant moneys.

¶ 60     For the foregoing reasons, I respectfully dissent.