**WASHINGTON, D.C. ASSOCIATION OF REALTORS, INC., et al., Appellants,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 11–CV–833.**

District of Columbia Court of Appeals.

Argued May 3, 2012.

Decided May 24, 2012.

---

L. Mark Winston, with whom Steven M. Glazer and Steven C. Kahn, Rockville, MD, were on the brief, for appellants.

James C. McKay, Jr., Senior Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee.

Before GLICKMAN, FISHER, and BECKWITH, Associate Judges.

GLICKMAN, Associate Judge:

Appellants—the Washington, D.C. Association of Realtors, Inc., the Greater Capital Area Association of Realtors, Inc., and the Greater Washington Commercial Association of Realtors, Inc.—contend that the Council of the District of Columbia violated the Home Rule Act when it directed the transfer of monies from the Real Estate Guarantee and Education Fund to the District of Columbia's General Fund for the purpose of balancing the District's budget for Fiscal Year 2009. Appellants further assert that the diversion of funds contravened the Real Estate Licensure Act of 1982, the legislation that created the Real Estate Fund. In an effort to undo the transfer and to void subsequent special assessments levied to replenish the Real Estate Fund, appellants sued the District in Superior Court, seeking declaratory and injunctive relief. The Superior Court rejected appellants' arguments, upheld the lawfulness of the Council's actions, and granted summary judgment to the Dis-

trict. Because we agree that the Council acted within its legislative authority under the Home Rule Act and in accordance with law, we affirm the judgment of the Superior Court.

## I. Factual and Statutory Background

In November 2008, facing unexpected revenue shortfalls and needing to meet its statutory obligation to present a balanced budget to Congress,[1] the Council commenced a series of remedial measures. The Council adopted the Fiscal Year 2009 Balanced Budget Support Emergency Declaration Resolution of 2008, which declared the existence of a fiscal emergency and outlined the steps that would be taken to meet it.[2] Next, the Council enacted the Fiscal Year 2009 Balanced Budget Support Emergency Amendment Act of 2008.[3] This Act (hereinafter referred to as the "December 2008 Act") directed the Chief

Financial Officer to transfer the available balances in a total of 69 designated "O-type," or special, funds[4] to the District's General Fund,[5] "[n]otwithstanding any other provision of law limiting the use of O-type funds for special purposes."[6] Pursuant to this directive, a total of $48 million was transferred to the General Fund, including $3,252,618 from the Real Estate Guarantee and Education Fund (hereinafter, the "Real Estate Fund").

As the December 2008 Act was passed as emergency legislation, it was effective only for 90 days from its enactment.[7] However, the Council also enacted the Fiscal Year 2009 Balanced Budget Temporary Amendment Act of 2008[8] through the non-emergency legislative process.[9] This Act confirmed the transfers of special fund balances to the General Fund.[10] (The Act

---

1. *See* D.C.Code § 1–204.42(a)(1) (2001).

2. D.C. Resolution 17–856, 55 D.C.Reg. 12119 (Nov. 28, 2008) (passed November 10, 2008) (resolving to "amend the Fiscal Year 2009 Budget Support Act of 2008, along with several other laws, to ensure that a balanced budget is sent to Congress, and to establish a reserve fund to ensure that the District can maintain a balanced budget if the February revised revenue estimate reveals a further financial downturn").

3. D.C. Act 17–572, 55 D.C.Reg. 12452 (Dec. 12, 2008) (passed December 2, 2008, effective for 90 days).

4. "Special funds" and "other-type," or "O-type funds," are one and the same. Other-type funds are defined in D.C.Code § 47–368.01(a) (2001) as "District revenues, as defined in § 1–201.03(10), generated from fees, fines, assessments, or reimbursements by the District of Columbia or its agencies or instrumentalities (including independent agencies or instrumentalities), earmarked for special purposes and accounted for or placed in a fund for such purposes." *See also* D.C.Code § 1–204.50 (2001) ("The Council may from time to time establish such additional special

funds as may be necessary for the efficient operation of the government of the District.").

5. *See* D.C.Code § 1–204.50 (establishing the General Fund of the District of Columbia as composed of "those District revenues which on January 2, 1975 are paid into the Treasury of the United States and credited either to the General Fund of the District or its miscellaneous receipts, but shall not include any revenues which are applied by law to any special fund existing on January 2, 1975").

6. D.C. Act 17–572 § 101, 55 D.C.Reg. at 12452; *see also id.* § 101(10)(A).

7. *See* D.C.Code § 1–204.12(a) (2001).

8. D.C. Act 17–631, 56 D.C.Reg. 502 (Jan. 16, 2009) (enacted December 22, 2008, effective only after Mayoral approval, a 30–day period of Congressional review as provided in D.C.Code § 1–206.02(c)(1), and publication in the District of Columbia Register).

9. *See* D.C.Code § 1–206.02(c)(1) (2001).

10. Thus, there is no merit to appellants' suggestion, pressed primarily in the trial court, that the transfer of funds pursuant to an emergency enactment impermissibly "re-

took effect on March 21, 2009, nineteen days after the December 2008 Act expired, but the interim period was covered by additional emergency legislation.[11])

The Real Estate Fund, the only special fund at stake in the present litigation, was established by the District of Columbia Real Estate Licensure Act of 1982 for the purpose of "compensat[ing] victims of unlawful real estate practices."[12] To achieve that goal, the Licensure Act requires all licensed real estate brokers, salespersons, and property managers to pay a fee (in an amount to be established by the Mayor) for deposit into the Real Estate Fund.[13] Whenever the balance in the Fund falls below a predetermined minimum, the Mayor is required to assess each licensee an amount, not to exceed $50 during any license year, to replenish it.[14] In order to fulfill that obligation after the transfer of over $3.2 million from the Real Estate Fund to the General Fund, the Mayor directed the Board of Real Estate [15] to collect a supplemental $50 fee from each licensee in January 2009.

That directive triggered the instant litigation. Appellants are three associations of realtors that do business in the greater Washington, D.C., area, including licensed brokers, salespersons, and property managers who were subject to the supplemental assessment. On their behalf, appellants filed suit in Superior Court in May 2009, asking the court to declare the December 2008 Act violative of the Home Rule Act and the Real Estate Licensure Act; to enjoin the District from transferring monies from the Real Estate Fund to the General Fund and require the District to replace the monies already withdrawn for that purpose; and to enjoin further special assessments to replenish the Real Estate Fund and require the District to refund the special assessments already paid. The trial court granted the District's motion for summary judgment. Concluding that the Home Rule Act did not prohibit the Council from directing the transfer of monies in the Real Estate Fund and other special funds to the District's General Fund, the court refused to "second guess" such a legislative budgetary decision "absent clear authority showing the means employed to be invalid." The court further held that nothing in the Real Estate Licensure Act prohibited the funds transfer.[16]

## II. Legal Analysis

Whether the Council had the authority to direct the transfer of monies from the

mained in effect" for more than 90 days without permanent legislative action.

**11.** Fiscal Year 2009 Balanced Budget Support Congressional Review Emergency Amendment Act of 2009, D.C. Act 18–13, 56 D.C.Reg.1920 (Mar. 6, 2009) (enacted February 23, 2009).

**12.** D.C.Code § 42–1701 (2001); *see also id.* § 42–1707(a) (providing that a person who obtains a final judgment for "fraud, misrepresentation, deceit, embezzlement, false pretenses, forgery, failure to account for conversion of trust fund, or violation" of the Act may seek reimbursement from the Real Estate Fund).

**13.** *Id.* § 42–1706(b); *see also id.* § 42–1707(j).

**14.** *Id.* § 42–1707(*l* ).

**15.** The Board of Real Estate was subsequently renamed the Real Estate Commission. *See* 56 D.C.Reg.2030 (Mar. 6, 2009).

**16.** As mentioned in footnote 10, *supra*, appellants also argued that it was impermissible to order the funds transfer by means of emergency legislation. The trial court rejected that argument, too. Initially, appellants claimed in addition that the special assessment of $50 on each licensee constituted an unlawful discriminatory tax. Appellants withdrew this latter claim without prejudice prior to the summary judgment stage, however, and it is not before us in this appeal.

Real Estate Fund and other special funds to the General Fund is purely a legal question—primarily one of statutory interpretation. There are no genuine issues of material fact, and the dispute was ripe for resolution on motion for summary judgment. Accordingly, our review of the trial court's legal determination in favor of the District is de novo.[17]

In passing the District of Columbia Home Rule Act,[18] Congress declared its intent, inter alia, to "grant to the inhabitants of the District of Columbia powers of local self-government ... and, to the greatest extent possible, consistent with the constitutional mandate [of Article I], relieve Congress of the burden of legislating upon essentially local District matters."[19] In furtherance of this goal, Congress directed that the legislative power of the District, which it vested in the Council, "shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of [the Home Rule] Act...."[20] In view of this broad delegation of authority and the policy of the Home Rule Act, we have held that limitations on the Council's legislative authority will be construed narrowly.[21]

The Home Rule Act operates much like a state constitution, and it specifies that the Council has no authority to pass any act contrary to its provisions.[22] Appellants claim that the Council transgressed this limitation. They argue that § 450 of the Home Rule Act bars the Council from moving monies from special funds to the District's General Fund. We do not agree.

▪ In § 450, Congress established the General Fund of the District and provided for special funds as well. The section reads as follows:

> The General Fund of the District shall be composed of those District revenues which on the effective date of this title [i.e., January 2, 1975 [23]] are paid into the Treasury of the United States and credited either to the General Fund of the District or its miscellaneous receipts, but shall not include any revenues which are applied by law to any special fund existing on the date of enactment of this

17. See, e.g., Quattlebaum v. Barry, 671 A.2d 881, 884–85 (D.C.1995) (affirming summary judgment for the District on a challenge to the Council's decision to reduce benefits for AFDC recipients in response to a severe revenue shortfall and budget crisis).

18. The Home Rule Act is codified at D.C.Code §§ 1–201.01–1–207.71 (2001).

19. Id. § 1–201.02(a).

20. Id. § 1–203.02; see also id. § 1–204.04(a).

21. See Bergman v. District of Columbia, 986 A.2d 1208, 1226 (D.C.2010) (holding that restrictions on the Council's legislative authority "must be narrowly construed, so as not to thwart the paramount purpose of the [Home Rule Act], namely to 'grant to the inhabitants of the District of Columbia powers of local self-government' "); see also Quattlebaum,

671 A.2d at 885 ("We are not authorized to second-guess [District] officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients. We should accede to a request for judicial intrusion upon what we regard as a core legislative function only if it is plain that the Council's action contravenes [federal legislation].").

22. See D.C.Code § 1–206.02(a). Section 602 of the Home Rule Act enumerates other specific restrictions on the Council, none of which are applicable here.

23. See D.C.Code § 1–207.71(c) (providing that, except for § 401(b), Title IV of the Home Rule Act ("The District Charter"), which includes § 450, "shall take effect January 2, 1975, if Title IV is accepted by a majority of the registered qualified electors in the District of Columbia voting on the charter issue in the charter referendum").

title [i.e., December 24, 1973[24]]. The Council may from time to time establish such additional special funds as may be necessary for the efficient operation of the government of the District. All money received by any agency, officer, or employee of the District in its or his official capacity shall belong to the District government and shall be paid promptly to the Mayor for deposit in the appropriate fund, except that all money received by the District of Columbia Courts shall be deposited in the Treasury of the United States or the Crime Victims Fund.[25]

Appellants argue that § 450 distinguishes special funds from the General Fund, does not authorize the Council to commingle monies in special funds with the General Fund, and implicitly contemplates that special funds will be kept separate indefinitely unless Congress itself decides otherwise or the Home Rule Charter is amended. Thus, appellants assert, by stating that the General Fund "shall not include any revenues which are applied by law to any special fund existing" when the Home Rule Act was enacted, the first sentence of § 450 explicitly prohibits the Council from *ever* transferring monies from those special funds to the General Fund. And while the second sentence of § 450 empowers the Council to create additional special funds (such as the Real Estate Fund), the third sentence makes clear that monies received by the District must be deposited in "the appropriate fund"—a requirement appellants say would be meaningless if the Council were at liberty to remove such monies properly deposited in a special fund in order to augment the General Fund.

In our view, appellants misread § 450. On its face, that provision says nothing to inhibit the Council from legislating a transfer of monies out of a special fund and into the General Fund. And no such prohibition is implied. Contrary to appellants' reading, the first sentence of § 450 merely defined how the initial balance of the newly established General Fund of the District of Columbia was to be constituted and made clear that pre-existing special funds, created to serve particular local needs, were not being terminated or discontinued by virtue of the transition to Home Rule. The sentence does not purport to restrict the Council's subsequent authority over those funds. And § 450's third sentence merely directs that, as government revenues are received, they be allocated appropriately among the District's several funds. The sentence cannot fairly be read as a restriction on the Council's ability to reallocate by legislation the balances in special funds over which it has authority.

The second sentence of § 450 expressly authorizes the Council to "establish such additional special funds as may be necessary for the efficient operation of the government of the District." The sentence speaks to the establishment of special funds, and not to the Council's subsequent control and deployment of them. But it is a general rule of statutory construction that "[w]here a statute confers powers or duties in general terms, all powers and duties incidental and necessary to make such legislation effective are included by

24. *See* District of Columbia Self–Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (enacted December 24, 1973).

25. *Id.* § 450 (codified at D.C.Code § 1–204.50). The final clause of the last sentence

of § 450, dealing with money received by the District of Columbia Courts, was added by Congress in 1997. *See* Balanced Budget Act of 1997, Pub.L. No. 105–33, 111 Stat. 251, § 11243(c).

implication."[26] Continuing authority to control the fate of special funds is a logical incident of the power to create them, if they are to serve the efficient operation and changing needs of the government. The only thing "special" about special funds is that they are created because of their usefulness in serving particular governmental purposes. As we have said in the past, the allocation of the District's financial resources is a "core legislative function."[27] If the Council determines that a special fund has outlived its usefulness, that monies in a special fund are no longer needed for the fulfillment of the fund's purpose, or that other public needs for those monies take precedence, a rebalancing and reallocation of the funds makes sense and is undeniably a "rightful subject" of legislation. There is nothing novel or unprecedented about this interpretation of § 450. It is in keeping with the widely recognized principle that a state legislature may, by statute, divert special funds set aside for particular purposes to a different purpose so long as doing so would not contravene a specific constitutional provision controlling the fund or breach a contractual obligation.[28]

For the foregoing reasons, we conclude that the December 2008 Act (and the subsequent legislation) directing the Chief Financial Officer to transfer available balances from the Real Estate Fund and other special funds to the General Fund in order to meet the District's financial emergency did not violate any prohibition

26. 2B Sutherland Statutory Construction § 55:4 (7th ed.2011).

27. *Quattlebaum v. Barry*, 671 A.2d 881, 885 (D.C.1995).

28. *See Des Moines Metro. Area Solid Waste Agency v. Branstad*, 504 N.W.2d 888, 890 (Iowa 1993) (holding that a fund becomes "immune from diversion by a subsequent legislative transfer only when the diversion would conflict with a constitutional provision or impair a contractual relationship") (citing *Mich. Sheriffs' Ass'n v. Mich. Dep't of Treasury*, 75 Mich.App. 516, 255 N.W.2d 666 (1977); internal quotation marks omitted); *see also A.B.A.T.E. of Ill., Inc. v. Quinn*, 354 Ill.Dec. 282, 957 N.E.2d 876, 881 (2011) ("It has long been recognized that the legislature has the authority to order monies collected in one fund be transferred into a different fund." (citing other state cases)); *Bd. of Trs. of Tobacco Use Prev. & Control Found. v. Boyce*, 127 Ohio St.3d 511, 941 N.E.2d 745, 749 (2010) (upholding state legislature's authority to abolish a state foundation for tobacco use prevention and to liquidate the foundation's endowment into the state's general fund, reasoning that the legislature's plenary power "enables it to pass any law unless it is specifically prohibited by the state or federal Constitutions" (internal quotation marks omitted)); *Goldston v. State*, 199 N.C.App. 618, 683 S.E.2d 237, 243 (2009) (upholding authority of state legislature to transfer monies from the Highway Trust Fund to the state general fund because the fund was not expressly protected under the state constitution); *Barber v. Ritter*, 196 P.3d 238, 253 (Colo.2008) (upholding transfer of monies from special cash funds to the state general fund to address a revenue shortfall because, *inter alia*, "the power of the legislature, except as otherwise restricted by the constitution, is plenary over the entire subject [of appropriations]" (internal quotation marks omitted)); *Apa v. Butler*, 638 N.W.2d 57, 63 (S.D.2001) (recognizing state legislature's authority to transfer appropriations from special funds, consistent with the principle that "the legislature has the power to alter, change, or transfer an appropriation, unless the appropriation has been pledged by constitutional or statutory provisions to the payment of some obligation under circumstances where the charge on such appropriation has become a vested right" (internal quotation marks omitted)); 81A C.J.S. States § 387 (2011) ("The legislature has the power ... to transfer to another fund, or appropriate to another purpose, any surplus which remains in a special fund after the accomplishment of the purpose for which it was established. Additionally, whether or not the purpose for which a special fund was created has been accomplished, such fund may generally be diverted by statute to another and different purpose, as long as it remains subject to legislative control.").

in § 450 of the Home Rule Act. The legislation was within the Council's authority to enact.

■ Appellant's remaining contention, that the Real Estate Licensure Act precluded the Council from transferring monies in the Real Estate Fund to the General Fund, is similarly unavailing. To begin with, nothing in the Licensure Act can be read to inhibit the Council from effecting such a transfer. While D.C.Code § 42–1707(j) requires "[a]ll sums paid pursuant to [the Act] [to] be deposited with the D.C. Treasurer and ... credited to the [Real Estate] Fund," it does not purport to bar the Council from redirecting monies in the Fund as the need arises. More importantly, even if the Licensure Act were construed to contain such a provision, it could not prevent the Council from doing what it did in this case. The Licensure Act was enacted by the Council, and the Council was free to repeal, amend, or override it. It is well established that "one legislature

cannot bind a future legislature." [29] If the December 2008 Act conflicts with the previously enacted Licensing Act, then "the later [statute] supersedes the earlier." [30]

We hold that the Council had the legislative authority to enact the laws directing the transfer of monies from the Real Estate Fund to the District's General Fund. The December 2008 Act did not violate the Home Rule Act, and it was not precluded by the Real Estate Licensure Act. Accordingly, we affirm the trial court's grant of summary judgment to the District on appellants' complaint for declaratory and injunctive relief.

*So ordered.*

**29.** *A.B.A.T.E. of Ill.,* 354 Ill.Dec. 282, 957 N.E.2d at 884; *see also, e.g., Reichelderfer v. Quinn,* 287 U.S. 315, 318, 53 S.Ct. 177, 77 L.Ed. 331 (1932) ("[T]he will of a particular Congress ... does not impose itself upon those to follow in succeeding years."); *Bd. of Trustees of Tobacco Use Prev. & Control Found.,* 941 N.E.2d at 751 ("No general assembly can guarantee the continuity of its

legislation or tie the hands of its successors." (internal quotation marks omitted)); *Goldston,* 683 S.E.2d at 243 ("One general Assembly traditionally cannot bind another.").

**30.** *George Washington Univ. v. D.C. Bd. of Zoning Adjustment,* 831 A.2d 921, 943 (D.C. 2003).