NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190718-U

NO. 4-19-0718

IN THE APPELLATE COURT

FILED
August 3, 2020
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| MARK H. GREENE III, M.D., | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| PASSAVANT MEMORIAL AREA HOSPITAL | ) | No. 12L201 |
| ASSOCIATION, a Not-for-Profit Corporation; | ) | |
| PASSAVANT PHYSICIAN ASSOCIATION, SC, a | ) | |
| Not-for-Profit Corporation; SPRINGFIELD CLINIC, | ) | Honorable |
| LLP; and DARR W. LEUTZ, M.D., | ) | Adam Giganti, |
| Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE TURNER delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The circuit court did not err by granting summary judgment in favor of defendants
and against plaintiff on all six counts of plaintiff's second-amended complaint.

¶ 2   In August 2012, plaintiff, Mark H. Greene III, M.D., filed a five-count complaint

against defendants, Passavant Memorial Area Hospital Association, a not-for-profit corporation

(Hospital); Passavant Physician Association, SC, a not-for-profit corporation (Association);

Springfield Clinic LLP (Clinic); and Darr W. Leutz, M.D.  All five counts asserted a claim of

tortious interference with a prospective economic advantage.  Plaintiff amended his complaint

twice.  The second-amended complaint added an additional count of the same tort against the

Clinic (count VI).  In August 2017, the Clinic and Dr. Leutz filed a joint motion for summary

judgment, asserting plaintiff could not prove a *prima facie* case of tortious interference against

them and a privilege applied to their actions.  In May 2018, the Hospital and the Association also

filed a joint motion for summary judgment, arguing plaintiff could not prove a *prima facie* case of the tort against them and a privilege applied to their actions as well. Defendants also supplemented their motions for summary judgment several times. In November 2018, plaintiff filed a response to defendants' summary judgment motions. In August 2019, the Sangamon County circuit court held a hearing on the two motions for summary judgment and their supplements. The court later entered two written orders granting summary judgment in favor of defendants and against plaintiff on all six counts.

¶ 3        Plaintiff appeals, asserting the circuit court erred by granting summary judgment in defendants' favor on all six counts. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        In 2002, plaintiff began practicing medicine in Jacksonville, Illinois, as an orthopedic surgeon and was fellowship trained in hand surgery. Before coming to Jacksonville, plaintiff had previously practiced medicine in Utah. In Jacksonville, plaintiff was a member of the Hospital's medical staff. Dr. Leutz, who was an orthopedic surgeon specializing in sports medicine, had recruited plaintiff to Jacksonville. Plaintiff and Dr. Leutz practiced together as Regional Orthopedics and Sports Medicine until April 2009. During that time, plaintiff and Dr. Leutz practiced from the same suite of offices, shared office staff, utilized the same billing and accounting services, and maintained an arrangement for sharing the office expenses. From 2002 until 2008, plaintiff and Dr. Leutz were two of the four orthopedic surgeons in Jacksonville. The general consensus was the Jacksonville area could support four orthopedic surgeons. In summer 2008, one of the other orthopedic surgeons died, leaving just three orthopedic surgeons in Jacksonville.

¶ 6        While practicing in Jacksonville, 70% of plaintiff's cases involved hand surgery.

According to plaintiff, the nature of the services provided by a hand surgeon is for a relatively short time. As such, it was important he received new patients. Plaintiff received referrals from the Hospital's emergency room and physicians in the community. Plaintiff's annual salary from 2003 to 2008 ranged from $336,050 (2004) to $556,550 (2008). In 2009, he made $514,825 and $456,169 in 2010. In 2011, plaintiff earned $141,107 and $151,917 in 2012.

¶ 7        In April 2009, Dr. Leutz became a partner of the Clinic, an ambulatory care provider with a principal place of business in Springfield, Illinois, with other satellite offices, including one in Jacksonville. The Clinic had declined to employ plaintiff. The Association, a not-for-profit corporation employing physicians to provide medical services to the public in the Jacksonville area, had also initially chosen not to employ plaintiff. Although the Association did end up hiring plaintiff, several of the Hospital's administrators were opposed to hiring him. Plaintiff's contract with the Association was for two years, ending on March 31, 2011. The contract provided the patients' medical charts were the property of the Association. Plaintiff was the only orthopedic surgeon employed by the Association. Plaintiff and Dr. Leutz remained in their same office space and operated under an office sharing agreement with the Clinic employing the office staff. Plaintiff acknowledged his referrals from Dr. Leutz diminished after Dr. Leutz joined the Clinic.

¶ 8        In August 2010, the Clinic hired Dr. Douglas Albracht to practice orthopedic medicine in Jacksonville with Dr. Leutz. At that time, Jacksonville again had four orthopedic surgeons. Plaintiff was the only hand surgeon of the four. Between August 2010 and March 2011, Dr. Albracht saw between 50 to 92 new patients per month. From January to July 2010, plaintiff saw on average 337 patients per month. In August 2010, he saw only 268 patients. From August 2010 to March 2011, he saw on average 235 patients per month. The Hospital's

records show the annual number of surgeries performed by plaintiff from 2006 to 2010 ranged between 372 and 448, and he performed 64 surgeries during the first three months of 2011.

¶ 9        In late August or early September 2010, Sarah Barrowes injured her leg in a bicycle/motor vehicle accident and was taken to the Hospital. Sarah was examined in the emergency room and diagnosed with a fracture. Sarah's mother, Terese Barrowes, stated, in her affidavit, the individual who treated Sarah referred her to several orthopedic surgeons but did not mention plaintiff's name. Since Terese was acquainted with plaintiff, she asked Sarah to be referred to him. According to Terese, if she had not asked, plaintiff's name would not have been provided to her.

¶ 10        On December 4, 2010, the Association notified plaintiff it would not be renewing plaintiff's contract. In his deposition, Chester Wynn, the Hospital's chief executive officer during the relevant period, stated plaintiff's contract was not renewed due to quality of care issues and patients and others having difficulties in contacting plaintiff. In his deposition, plaintiff stated that, when he asked why his contract was not being renewed, Wynn and Stephen Lee, the Hospital's physician services officer, told him his patient numbers were down. Plaintiff questioned that reason and asked Wynn about the Hospital's association with the Clinic and Memorial Hospital. Wynn replied he would not do anything to disappoint the Clinic. Plaintiff believed the Clinic asked the Association not to renew plaintiff's contract.

¶ 11        In January and February 2011, Lee would stop by plaintiff's office periodically to ascertain what plaintiff was going to do when his contract ended. During one meeting, Lee gave plaintiff a list of operational issues plaintiff would need to address if he opened his own practice. Lee stated he did so to stimulate plaintiff to decide his future. On February 22, 2011, Lee made a note indicating he talked to plaintiff on the telephone about the fact plaintiff had not provided

Lee with a transition plan or patient notification letter. Lee informed plaintiff they were at " 'end of the line' " in terms of being able to provide adequate notification to patients. Lee told plaintiff he needed a letter "today" to provide adequate notification. Plaintiff responded, "he 'would work on it.' " Lee again asked for plaintiff to give him a letter "today." In his deposition, plaintiff admitted he never gave Lee a draft of a patient notification letter. He also acknowledged Lee stopped by "a few times" asking for a patient notification letter.

¶ 12 Sometime in January 2011, Lee went to plaintiff's office and was looking around and noticed the patient charts of Regional Orthopedics, Dr. Leutz, and plaintiff were not stored separately. The patient charts were stored in a manner in which they could not easily be separated by the medical provider. Lee asked Pam Hoskins West, the Clinic's operations manager in Jacksonville, what he should do with the patient charts. Hoskins West suggested it might be an opportunity to digitize the patient records with the Clinic.

¶ 13 In his second supplemental affidavit, plaintiff stated he had a chance encounter with Dr. John Peterson, a family practice physician, on February 3, 2011. Plaintiff asked Dr. Peterson why his practice group was no longer referring patients to him. Dr. Peterson responded he had tried to refer patients to plaintiff but plaintiff's receptionist stated plaintiff was no longer accepting new patients. Following his conversation with Dr. Peterson, plaintiff spoke with Trudy Stubbe, who served as his receptionist and was a Clinic employee. According to plaintiff, Stubbe stated her supervisor, Hoskins West, had told her to no longer accept new patients for plaintiff.

¶ 14 On February 24, 2011, the Association sent a letter to plaintiff's patients informing them of the following: (1) plaintiff would no longer be employed by the Association effective April 1, 2011; (2) the Association was transferring the medical records for plaintiff's

patients to the Clinic on April 1, 2011; and (3) the patients had three options for the transfer of their records. The first option was to establish care with a Jacksonville-based orthopedist. The letter noted Dr. Barry Werries, Dr. Leutz, and Dr. Albracht were well-qualified orthopedic surgeons who were based in Jacksonville and provided their telephone numbers. The second option was to request a copy of the patient's record for future personal use. The third option was to request the patient's record be transferred to another physician. Also, on February 24, 2011, the Clinic and the Association entered into a written agreement for the transfer of plaintiff's patient records to the Clinic on April 1, 2011.

¶ 15        On March 1, 2011, plaintiff sent his own letter to his patients, stating he was going to continue his practice in Jacksonville. Lee and Hoskins West did not know for sure what plaintiff was doing after his contract ended until plaintiff's March 1, 2011, letter to his patients, which was found by Clinic staff after plaintiff left it on the copier. After his employment with the Association ended, plaintiff remained on staff at the Hospital until March 1, 2014, when plaintiff relinquished his privileges.

¶ 16        On April 14, 2011, Dr. Bruce Sands, an emergency room physician in the Hospital, requested plaintiff, who was on call, to provide medical treatment to Z.P., who had a displaced left hip from an all-terrain vehicle accident. Z.P. was a patient of Dr. Leutz. Plaintiff performed an open reduction procedure on Z.P. to repair the rare and difficult injury.

¶ 17        When Dr. Leutz arrived at the hospital on April 15, 2011, he had a brief conversation with Dr. Sands in the physicians' lounge. Dr. Leutz again saw Dr. Sands that morning on the orthopedic floor. Dr. Sands told him about a difficult hip dislocation case he had with plaintiff and noted it was rough getting the hip put back in place. Dr. Sands stated he was trying to finish charting on the patient. After talking with Dr. Sands, Dr. Leutz talked with some

- 6 -

members of the operating room staff and looked at Z.P.'s X-rays. Dr. Leutz was worried Z.P., who was 20 years old at the time, might have issues with stability and early arthrosis of the joint because a fragment had been sheared off the femoral head and was left unattached. That type of fracture is known as a Pipkin 1 fracture. He was worried the piece of bone might need to be repaired. Dr. Leutz expressed his concerns about Z.P. to Dr. Peter Russotto, who was then the chair of the Hospital's executive committee. Dr. Leutz had tried to talk with the chief of surgery, Dr. Fenner, but he was not available. Dr. Leutz showed Dr. Russotto the X-rays and voiced his concern more surgery was needed. Dr. Leutz believed the femoral head needed to be fixed fairly quickly. Z.P. ended up being transferred to Barnes Hospital where the fracture was fixed.

¶ 18        At around 1 p.m. on April 15, 2011, plaintiff was notified his practice privileges at the Hospital were being summarily suspended effective immediately due to plantiff's egregious care in treating Z.P. Dr. Leutz denied asking for plaintiff's suspension and stated he had no input in the executive committee's decision to summarily suspend plaintiff's privileges. Plaintiff's medical privileges at the Hospital were suspended from April 15 to May 25, 2011. Due to the suspension of his medical privileges, plaintiff lost several opportunities to do *locum tenens* work at other medical facilities and at a correctional facility.

¶ 19        Both in an April 15, 2011, letter to plaintiff's patients and in an advertisement in the April 16, 2011, edition of the Jacksonville Courier Journal, the Clinic notified plaintiff's patients their patient records had been transferred to the Clinic. Both notices encouraged plaintiff's patients to take one of the following actions: (1) establish care with a Clinic orthopedist, (2) request a copy of the record for future use, or (3) request the record be transferred to another physician. Regarding the first option, the notice stated two Springfield-based orthopedic specialists would be seeing patients in Jacksonville starting in May

2011.  One of those physicians was Dr. Christopher Wottowa, who was identified as an "upper-extremity and hand surgery specialist."

¶ 20    In August 2012, plaintiff filed his five-count complaint against defendants, asserting five counts of tortious interference with a business expectancy.  Plaintiff filed amended complaints in May 2013 and June 2014.  The June 2014 second-amended complaint added an additional count of tortious interference with a business expectancy against the Clinic and expanded on the factual allegations against Dr. Leutz and the Clinic.  Count I of the second-amended complaint was against the Hospital, count II was against the Association, and count V was against Dr. Leutz.  The other three counts were against the Clinic.  Count III alleged the Clinic interfered with plaintiff's expectancy of treating surgical patients at the same level and frequency as he did prior to September 2010.  Count IV contended the Clinic interfered with plaintiff's employment contract with the Association by having its staff inform individuals who attempted to make appointments with plaintiff that plaintiff was not accepting new patients, which resulted in the Association not renewing his contract due to low patient numbers.  Count VI alleged Dr. Leutz was acting during the course of his employment with the Clinic and, in part, with the intent to benefit the Clinic when Dr. Leutz voiced concerns about plaintiff's treatment of Z.P.

¶ 21    In August 2017, the Clinic and Dr. Leutz filed a joint motion for summary judgment, asserting plaintiff cannot adduce evidence from the record to show a genuine issue of material fact existed to prove either a *prima facie* case of plaintiff's tortious interference claim against Dr. Leutz or, in the alternative, Dr. Leutz acted in a willful or wanton manner causing physical harm and thereby excluding his actions from the qualified immunity under the Hospital Licensing Act (210 ILCS 85/10.2 (West 2010)).  The motion also asserted plaintiff was unable to

prove either a *prima facie* case of his tortious interference claim against the Clinic or the Clinic was unjustified in any interference incidental to its privileged competition in the field of orthopedic medicine in Jacksonville.  The Clinic and Dr. Leutz filed a memorandum in support of their joint motion for summary judgment.  Attached to the memorandum were the following exhibits:  (1) the August 2017 affidavit of Gyl Kincaid, the Clinic's vice president of finance and controller; (2) Dr. Leutz's December 2014 affidavit; (3) plaintiff's deposition; (4) Lee's deposition; (5) Wynn's deposition; (6) the deposition of Mark Kuhn, the Clinic's chief administrative officer during the relevant period; (7) the deposition of Rebecca Goodman Currier, the Hospital's director of quality assurance; (8) Dr. Russotto's deposition; (9) Lee's notes regarding his conversations with plaintiff about plaintiff's plans after the expiration of his contract and the list of issues the Hospital's operating room staff had with plaintiff which was presented on September 27, 2010, to Goodman Currier; (10) the deposition of Linda Meadows, the Clinic's director of health information services during the relevant period; (11) plaintiff's January 2013 affidavit; and (12) the deposition exhibits.

¶ 22        In May 2018, the Association and the Hospital filed a joint motion for summary judgment, also asserting the privilege of competition and noting plaintiff did not allege the Association breached its employment contract with plaintiff.  The motion also argued plaintiff could not adduce any evidence to show the decline in his orthopedic practice following the termination of his employment agreement was due to the actions of the Hospital or the Association but rather was due to plaintiff's own inability to establish a successful independent orthopedic practice, his quality of care issues, and his reputational problems with other physicians who were typically a referral source for his cases.  In support of their motion, the Hospital and the Association filed a supporting memorandum and the following exhibits:

(1) plaintiff's second-amended complaint; (2) plaintiff's deposition; (3) Lee's deposition; (4) Wynn's deposition; (5) Hospital staff's list of problems with plaintiff noted at a September 27, 2010, meeting with Goodman Currier; (7) the deposition of Cheryl Lindsey, an operating room nurse at the Hospital; (8) the deposition of Jacquelyn Cooper, a surgical technician at the Hospital; (9) Dr. Leutz's September 2012 affidavit; and (10) Dr. Leutz's December 2014 affidavit.

¶ 23       In June 2018, the Clinic and Dr. Leutz filed a supplemental memorandum, attaching the following new exhibits:  (1) Dr. Leutz's deposition, (2) Lindsey's deposition, (3) Cooper's deposition, (4) Z.P.'s hospital records, (5) the deposition of Patricia Kuhn, (6) the affidavit of Cal Thomas, the Clinic's regional operations director of outreach during the relevant period, and (7) deposition exhibits.  The Hospital and the Association also filed a supplemental memorandum, attaching the deposition of Dr. Albracht.  Thereafter, the Clinic and Dr. Leutz filed a second supplement to their motion for summary judgment, addressing Dr. Albracht's deposition testimony and attaching his deposition.

¶ 24       In November 2018, plaintiff filed a memorandum in opposition to defendants' motions for summary judgment.  Plaintiff attached the following documents to his memorandum: (1) his January 2013 affidavit; (2) his September 2013 affidavit; (3) his November 2018 affidavit; (4) Dr. Leutz's August 2012 affidavit; (5) Dr. Leutz's September 2012 affidavit; (6) Dr. Leutz's December 2014 affidavit; (7) the affidavit of Terese; (8) the affidavit of Donald Waldrop, former chief operating officer of the Clinic; (9) Dr. Sands's affidavit; (10) the affidavit of Caren Mansfield, a paralegal for plaintiff's attorney, who examined the referral sources for plaintiff's patients; (11) plaintiff's answer No. 26 to the Hospital and the Association's interrogatories; (12) plaintiff's schedule for July and August 2010; (13) excerpts from plaintiff's

deposition; (14) excerpts from Dr. Leutz's deposition; (15) excerpts from Dr. Russotto's deposition; (16) excerpts from Dr. Albracht's deposition; (17) excerpts from Wynn's deposition; (18) excerpts from Lee's deposition; (19) excerpts from Currier's deposition; (20) excerpts from the deposition of Hoskins West; (21) excerpts from the deposition of Barbara Morris, a former switchboard operator for the Hospital; and (22) numerous exhibits.

¶ 25    In June 2019, the Clinic and Dr. Leutz filed a third supplemental memorandum in support of their motion for summary judgment, contending plaintiff's second-amended complaint fails as a matter of law. Regarding the counts based on Dr. Leutz's conduct (counts V and VI), they asserted plaintiff (1) failed to demonstrate a genuine issue of material fact concerning whether Dr. Leutz interfered with a business relation of plaintiff's with a specific third party or with an identifiable prospective class of third persons or otherwise directed any conduct at plaintiff's purported expectancy and (2) did not present any facts precluding the entry of summary judgment based on Dr. Leutz's immunity under the Illinois Hospital Licensing Act. As to the counts against the Clinic, they argued plaintiff (1) failed to demonstrate a genuine issue of material fact concerning whether the Clinic directed any conduct towards plaintiff's employment relationship with the Association in count III and (2) did not present any facts refuting the Clinic's privilege to engage in lawful competition. The Hospital and the Association also filed another supplemental motion for summary judgment, asserting plaintiff's second-amended complaint failed as a matter of law. The Hospital and the Association argued plaintiff (1) had not demonstrated a genuine issue of material fact concerning whether they interfered with a business relation of plaintiff's with a specific third party or with an identifiable prospective class of third persons or otherwise directed any conduct at plaintiff's purported expectancy, (2) did not and could not overcome the immunity afforded them under the Illinois

- 11 -

Hospital Licensing Act, and (3) did not present any facts negating their privilege to engage in lawful competition, which was in the interests of ensuring access to quality healthcare to members of the Jacksonville community.

¶ 26    On August 15, 2019, the circuit court held a hearing on defendants' motions for summary judgment. At the end of the hearing, the court asked all parties to submit proposed orders.

¶ 27    On September 18, 2019, the circuit court entered a written order granting summary judgment in favor of the Hospital and the Association on counts I and II. The court found the Association's termination of plaintiff's employment contract could not give rise to a tortious interference claim because a party cannot interfere with its own contract. The court also found plaintiff did not establish conduct by the Hospital and the Association directed towards third parties or an identified prospective class of third parties that interfered with plaintiff's expectancy. Additionally, the court held as a matter of law the Hospital and the Association were privileged and reasonable in advancing their interests in ensuring quality and available orthopedic surgeons and did not tortiously interfere with plaintiff's expectations in continued patient referrals and business.

¶ 28    That same day, the circuit court entered a written order granting summary judgment in favor of the Clinic and Dr. Leutz on Counts III, IV, V, and VI. The court found plaintiff did not have a reasonable expectancy of a continuing or new business relationship with the Association's patients, which were the patients he was treating during the claimed interference. Further, the court noted plaintiff had more than enough time to identify specific third parties toward whom the Clinic or Dr. Leutz aimed their interference that was unjustified, malicious, or odious in light of their respective privileges and had failed to name one such

- 12 -

patient or referring physician. The court also found, *inter alia*, the advertisement in the newspaper, the hiring of Dr. Albracht, the planning to bring additional orthopedists to Jacksonville, and the obtaining of plaintiff's patients' records from the Association were done in the context of competition and were not malicious, odious, or unjustified. As to the allegation of the Clinic's office staff informing prospective patients plaintiff was no longer seeing new patients, the court noted plaintiff had failed to identify a single patient toward whom that conduct was directed. The court also found the conduct when taken in context was not malicious, odious, or unjustified. As to Dr. Leutz, the court found his conduct of voicing concerns about plaintiff's care of Z.P. to Dr. Russotto was privileged, not aimed at any of plaintiff's patients or physicians who referred to him, and immunized under the Hospital Licensing Act.

¶ 29    On October 15, 2019, plaintiff filed a timely notice of appeal from both summary judgment orders in compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017), and thus this court has jurisdiction under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 30                              II. ANALYSIS

¶ 31    On appeal, plaintiff challenges the circuit court's grant of summary judgment in favor of all four defendants on his second-amended complaint. A circuit court's ruling on a motion for summary judgment presents a question of law, and thus we apply the *de novo* standard of review. *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611, ¶ 22, 957 N.E.2d 876. Section 2-1005(c) of the Code of Civil Procedure (735 ILCS 5/2-1005(c) (West 2016)) provides summary judgment is proper when the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "In determining the existence of a genuine issue of material fact, courts must consider the pleadings, depositions, admissions,

- 13 -

exhibits, and affidavits on file in the case and must construe them strictly against the movant and liberally in favor of the opponent." *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871 (1986).  Summary judgment is "a drastic means of disposing of litigation and therefore should be allowed only when the right of the moving party is clear and free from doubt." *Purtill*, 111 Ill. 2d at 240, 489 N.E.2d at 871.

¶ 32        Our supreme court has recognized the tort of interference with prospective economic advantage can arise in the context of an employment relationship and has set forth the following elements necessary to proving that tort:  "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference."  *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511, 568 N.E.2d 870, 877-78 (1991).  Additionally, the "[p]laintiff must plead facts to show interference of a business relationship with specific third parties or an identifiable prospective class of third persons." *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 529, 546 N.E.2d 33, 37 (1989) (citing *Parkway Bank & Trust Co. v. City of Darien*, 43 Ill. App. 3d 400, 403, 357 N.E.2d 211, 215 (1976)).  That requirement does not mean the plaintiff must allege the identity of the third party or parties by name.  *Downers Grove Volkswagen, Inc.*, 190 Ill. App. 3d at 529, 546 N.E.2d at 37.  Further, the action by the defendant must be directed toward that third party.  *Boffa Surgical Group LLC v. Managed Healthcare Associates Ltd.*, 2015 IL App (1st) 142984, ¶ 28, 47 N.E.3d 569.  "It is not enough for the defendant's action to impact a third party; rather, the defendant's action must be directed towards the third party."  *Boffa*, 2015 IL App (1st) 142984, ¶ 28.  Also, the supreme court observed that, when the defendant's conduct in

interfering with the contract or prospective economic advantage was privileged, the plaintiff bears the burden of pleading and proving the defendant's conduct was unjustified or malicious. *Fellhauer*, 142 Ill. 2d at 512, 568 N.E.2d at 878.

¶ 33      A majority of the issues on appeal relate to whether defendants' actions were directed at a specific third party.  The parties disagree on what is sufficient identification of third parties at the summary judgment stage.  With a motion to dismiss, the Illinois case law is clear. The plaintiff must plead facts showing an interference of a business relationship with "specific third parties or an identifiable prospective class of third persons."  *Downers Grove Volkswagen, Inc.*, 190 Ill. App. 3d at 529, 546 N.E.2d at 37.  In *Crinkley v. Dow Jones & Co.*, 67 Ill. App. 3d 869, 879-80, 385 N.E.2d 714, 721 (1978), the reviewing court pointed out the *Parkway Bank* court "used the term 'identifiable' rather than 'identified,' which to us indicates that the third party's specific identity or name is to be revealed at a subsequent time, such as at trial."  No Illinois case has directly addressed what the plaintiff must show at the summary judgment stage.

¶ 34      Plaintiff cites a decision by the South Dakota supreme court, which found an identifiable class of third parties was sufficient at the summary judgment stage.  See *Hayes v. Northern Hills General Hospital*, 1999 S.D. 28, ¶¶ 28-29, 590 N.W.2d 243.  There, the plaintiff, who was a physician, alleged all the named defendants acted to ensure he would not be able to reestablish a medical practice in Deadwood, South Dakota, and the plaintiff had to establish a practice elsewhere.  *Hayes*, 1999 S.D. 28, ¶ 7.  The plaintiff asserted the defendants interfered with the transfer of his patient records, patient calls, mail, and other information necessary for treating his patients.  He further contended they interfered with his attempt to rent medical office space.  *Hayes*, 1999 S.D. 28, ¶ 7 n.1.  The South Dakota supreme court found the plaintiff's identifiable class of third parties with whom the defendants allegedly interfered was " 'persons

seeking medical care in the Lead-Deadwood medical community from family practitioners from 1992 to the present.' " *Hayes*, 1999 S.D. 28, ¶ 28.  The court noted requiring prospective third parties to be identified by name would render the tort for the most part a nullity and would "never allow a plaintiff to proceed with its claim beyond summary judgment especially if the business enterprise is dependent upon a large pool of clientele." *Hayes*, 1999 S.D. 28, ¶ 29.  As to trial, the South Dakota supreme court stated the plaintiff would have to develop further evidence as to the third parties because the plaintiff would have to show the defendants' knowledge of the plaintiff's relationship with the third parties, the defendants' act, proof of harm and damages, and the defendants' act was wrong.  *Hayes*, 1999 S.D. 28, ¶ 31.  Additionally, we note the only issues in *Hayes* were what was meant by "identifiable" and whether the plaintiff provided enough evidence of "identifiable" third parties.  *Hayes*, 1999 S.D. 28, ¶ 22.

¶ 35          While an identifiable prospective class is sufficient to survive a motion to dismiss, the above-cited Illinois case law appears to require more specific identification at trial than South Dakota law.  As such, we find more than an identifiable prospective class needs to be shown at the summary judgment stage.  Moreover, the nature of the class will determine whether the individuals need to be named.

¶ 36                                    A. Dr. Leutz's Conduct

¶ 37          Plaintiff recognizes Dr. Leutz's conduct was not directed at a third party but contends Dr. Leutz's conduct prevented plaintiff from seeing patients at the Hospital.  In support of his contention that allegation is sufficient to establish a cause of action for interference with a prospective economic advantage, plaintiff cites section 766B of the Second Restatement of Torts (Restatement (Second) of Torts § 766B (1979)), which addresses the intentional interference of a prospective contractual relationship.  Section 766B states the following:

"One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation." Restatement (Second) of Torts § 766B (1979).

Plaintiff contends Dr. Leutz's actions falls under subsection (b). However, in his opening brief, plaintiff fails to cite any cases from Illinois applying subsection (b) to the tort of interference with prospective economic advantage. In his reply brief, plaintiff cites *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 485, 693 N.E.2d 358, 371 (1998), which quoted comment a of section 766B of the Second Restatement of Torts but did not specifically address subsection (b). We note the reviewing court in *Galinski v. Kessler*, 134 Ill. App. 3d 602, 607-09, 480 N.E.2d 1176, 1180-81 (1985), declined to extend the tort of interference with prospective economic advantage to include the situation where the interfering conduct was directed towards the plaintiff as opposed to a third party. Additionally, section 18 of the Restatement (Third) of Torts: Liability for Economic Harm specifically addresses the tort of intentional interference with prospective economic advantage and does not include the language stated in subsection (b) of section 766B of the Second Restatement of Torts. Restatement (Third) of Torts: Liability for Economic Harm § 18 (2014). Thus, plaintiff must show Dr. Leutz's conduct was directed at a third party to establish a claim for tortious interference with a prospective economic advantage.

¶ 38        Here, plaintiff admits he cannot prove Dr. Leutz's conduct related to Z.P.'s

- 17 -

treatment was directed towards a third party. Since plaintiff cannot establish one of the elements of his claim of tortious interference with a prospective economic advantage against Dr. Leutz, the circuit court properly granted summary judgment in favor of Dr. Leutz and against plaintiff (count V). Moreover, since plaintiff's count VI against the Clinic was based on Dr. Leutz's conduct related to Z.P.'s treatment, we also find the court properly granted summary judgment in favor of the Clinic and against plaintiff on count VI.

¶ 39        B. Other Defendants' Actions Towards Classes of Third Parties

¶ 40        As to the other defendants, plaintiff identifies two classes of individuals who were the objects of their interference. The first class was patients treated by plaintiff while he was a physician in Jacksonville, and the second class was prospective patients in the Jacksonville community who needed orthopedic care. Plaintiff claims the following actions were directed against the first class of individuals: (1) the Association's transfer of medical records to the Clinic; (2) the Association's February 24, 2011, letter to plaintiff's patients; (3) the Clinic's April 15, 2011, letter to plaintiff's patients; and (4) the Clinic's April 2011 newspaper advertisement. Plaintiff further claims the following actions were directed towards the second class of individuals: (1) the Clinic's falsely telling prospective patients plaintiff was not accepting new patients and diverting those individuals to Dr. Albracht and (2) the Hospital's emergency room failing to identify plaintiff as an orthopedic surgeon in the community to its patients. Defendants disagree.

¶ 41        All of the parties cite the decision of *Boffa*, 2015 IL App (1st) 142984, ¶ 27, where the plaintiffs, a medical group whose doctors had privileges at the hospital at issue in the case and two physicians in that medical group, alleged the defendants unfairly limited referrals of patients only to members of the defendants' physician group, which was restricted in size and

inadequate to service the needs of the hospital's patients. The plaintiffs also alleged the defendants' refusal to offer them membership into defendants' group prevented them from obtaining any referral business from fellow physicians who had patients at the hospital and thereby unlawfully prevented them from obtaining the necessary benefits and economic advantage that would have resulted from the "fill-in" service the plaintiffs provided at the hospital. *Boffa*, 2015 IL App (1st) 142984, ¶ 27. The *Boffa* court found the plaintiffs failed to meet the requirement of alleging a business expectancy with a specific third party. *Boffa*, 2015 IL App (1st) 142984, ¶ 29. The court explained the plaintiffs' complaint merely alleged the defendants' conduct prevented unnamed physicians from referring patients to the plaintiffs and prevented unnamed patients from receiving services from the plaintiffs. *Boffa*, 2015 IL App (1st) 142984, ¶ 29. Moreover, the plaintiffs failed to allege any conduct by the defendants directed at those unnamed physicians and patients. *Boffa*, 2015 IL App (1st) 142984, ¶ 29. Even if the defendants' conduct of not offering the plaintiffs membership in the defendants' group was likely to dissuade other physicians from making referrals to the plaintiffs or dissuade other patients from using the plaintiffs' services, " '[c]ourts have rejected [that] argument, instead requiring that the interfering action be directed in the first instance at the third party.' " *Boffa*, 2015 IL App (1st) 142984, ¶ 29 (quoting *Schuler v. Abbott Laboratories*, 265 Ill. App. 3d 991, 995, 639 N.E.2d 144, 148 (1993)).

¶ 42          Another physician case is *Willcutts v. Galesburg Clinic Ass'n*, 201 Ill. App. 3d 847, 849, 560 N.E.2d 1, 2 (1990), where the plaintiff, a physician of 25 years, asserted the defendants, who were a medical clinic and its physician members, were attempting to " 'freeze him out' " of the clinic's business matters and profit. The plaintiff specifically alleged, *inter alia*, the defendants' failed to refer patients to him, were reluctant to consult with him, and

- 19 -

conspired to expel him. *Willcutts*, 201 Ill. App. 3d at 849, 560 N.E.2d at 2. He also contended the defendants were attempting to make the plaintiff's patients their own and jeopardizing the health care of those patients and the community. *Willcutts*, 201 Ill. App. 3d at 849, 560 N.E.2d at 2-3. The reviewing court concluded the plaintiff's allegations against the defendants did not meet the requirements for a cause of action of tortious interference with prospective economic advantage under Illinois law. *Willcutts*, 201 Ill. App. 3d at 851, 560 N.E.2d at 4. The court noted the plaintiff had failed to allege specific actions by the defendants directed at third parties but, instead, had presented broad, conclusory allegations against the defendants. *Willcutts*, 201 Ill. App. 3d at 851, 560 N.E.2d at 4.

¶ 43                                   1. *Hospital*

¶ 44            As to the Hospital, the only conduct plaintiff alleges was directed to a class of third parties was the Hospital's emergency room's failure to identify plaintiff as an orthopedic surgeon in the community to its patients. The only individual plaintiff identifies as not being informed of plaintiff as an orthopedic surgeon in the Jacksonville community was Sarah Barrowes, who was still treated by plaintiff because her mother knew plaintiff. Beyond the mere existence of a decline in the number of plaintiff's patients, plaintiff does not note any other evidence showing the Barrowes's experience with receiving orthopedic referrals was routine in the emergency room. Plaintiff admitted he never saw any document in the emergency room telling staff not to provide his name as a referral or a list of orthopedic surgeons that did not include his name. We find the identification of one patient who did not receive plaintiff's name without any more evidence showing a pattern of not providing plaintiff's name is insufficient at the summary judgment stage to show interference of a business relationship with a class of third parties. At most, plaintiff has only shown a *prospective* class of third parties.

- 20 -

¶ 45        Even assuming plaintiff's supporting evidence was sufficient to show such conduct was directed towards a class of third parties, plaintiff does not show how that conduct was attributable to the Hospital. Plaintiff presented no evidence the Hospital directed employees in its emergency room not to refer patients to plaintiff. As stated, plaintiff admitted he never observed anything in writing in the Hospital's emergency room stating patients should not be referred to plaintiff or lists where he was not listed as an orthopedic surgeon. The Hospital argues emergency room physicians were free to refer patients to whomever they chose. Plaintiff does not refute that contention in his reply brief. Thus, we find no material question of fact exists showing the Hospital was the entity that did not refer its emergency room patients to plaintiff. Since this is the only conduct plaintiff identifies as being done by the Hospital and directed towards a third party, we find the circuit court properly entered summary judgment in favor of the Hospital on count I.

¶ 46                                2. *Association*

¶ 47        The two acts plaintiff alleges on the part of the Association were (1) its transfer of the records of plaintiff's patients to the Clinic and (2) the Association's February 24, 2011, letter to plaintiff's patients. The Association's transfer of the records of plaintiff's patients to the Clinic was not an action directed towards a class of third parties. Wynn explained that, while the Association had kept patient records of former physicians in the past, the Association had other physicians in the same specialty. With plaintiff, the Association did not employ another orthopedic surgeon and did not want to keep the records. The Association wanted the records with someone capable of providing orthopedic surgery services and capable of watching over the records. While the records transfer affected plaintiff's ability to see his patients' records, the Association's conduct of transferring the records was not directed at plaintiff's patients. Thus,

the Association's transfer of patient records does not support a claim of tortious interference with a prospective economic advantage.

¶ 48    As to the Association's February 24, 2011, letter, the letter was mailed to all of plaintiff's patients. While the letter failed to state plaintiff was still practicing medicine and how to contact plaintiff, the letter did not state anything derogatory about plaintiff or encourage the recipients not to seek treatment from him. Plaintiff sent his own letter to his patients on March 1, 2011, informing patients of his continued practice and providing his contact information. Plaintiff fails to identify one patient who did not seek treatment from him due to the Association's letter. Thus, we again find plaintiff has only shown a prospective class of third parties and not an identified class of third parties. Regardless, the Association presented evidence Lee asked plaintiff on multiple occasions to provide a transition plan and patient notification letter. It was only when plaintiff failed to do so the Association drafted the letter omitting information about plaintiff. Plaintiff admitted he had been contacted several times by Lee and did not give Lee the requested information. Plaintiff presented no evidence the Association purposefully interfered with plaintiff's ability to continue his relationship with his patients by sending the letter. See *Parkway Bank*, 43 Ill. App. 3d at 403, 357 N.E.2d at 215 (emphasizing the purposeful nature of the tort).

¶ 49    Since this court has concluded the two allegations plaintiff identifies as being directed at a third party do not state a claim for tortious interference with prospective economic advantage, we find the circuit court properly entered summary judgment in favor of the Association on count II.

¶ 50                    3. *Clinic*

¶ 51    Regarding the Clinic, the acts plaintiff alleges were directed at a third party are

the following: (1) the Clinic's April 15, 2011, letter to plaintiff's patients, (2) the Clinic's April 2011 newspaper advertisement, and (3) the Clinic's staff informing prospective patients plaintiff was not accepting new patients and directing the patients to Dr. Albracht.

¶ 52        As to the Clinic's letter and newspaper advertisement, that conduct was *directed* toward a definite group of third parties. However, plaintiff has failed to show *interference* of a business relationship with a class of third parties. Plaintiff admitted the nature of his orthopedic practice created short-term physician-patient relationships. Plaintiff also sent his own letter to his patients. Thus, under these circumstances, plaintiff needed to identify some specific third parties who did not seek his care as a result of the letter and advertisement to show such conduct interfered with plaintiff's legitimate expectancy of continuing his physician relationship with his patients. Additionally, plaintiff does not challenge the circuit court's finding the Clinic's letter and advertisement were normal competition and not malicious, odious, or unjustified. Thus, those actions by the Clinic would also have been protected by the privilege of competition.

¶ 53        The remaining conduct by the Clinic is plaintiff's allegation its staff was telling prospective patients of plaintiff's he was not taking new patients. The Clinic first asserts plaintiff's statements in his January 2013 affidavit concerning what Dr. Peterson told him about plaintiff's office personnel allegedly stating plaintiff was not taking new patients are inadmissible hearsay and cannot be considered. In his reply brief, plaintiff states he is offering Peterson's statement to show why he went to Stubbe and not to prove the truth of what Dr. Peterson told him. The Clinic does not directly challenge the admissibility of Stubbe's statement, which plaintiff asserts is not hearsay because it is a statement relating to matters within the scope of her employment (Ill. R. Evid. 801(d)(2)(D) (eff. Oct. 15, 2015)). We note plaintiff's affidavit is the only evidence of Hoskins West's directive to Stubbe to not schedule

- 23 -

new patients for plaintiff. Stubbe later denied making the statement to plaintiff, and Hoskins West stated she did not give such a directive to her staff. The Clinic further asserts plaintiff has failed to name one patient to whom it aimed its interference. Plaintiff contends the Clinic's action was clearly directed at a group of third parties seeking plaintiff's services.

¶ 54    Here, plaintiff is still only showing a prospective class of people. He has not further identified the class. While we recognize it would be very difficult to identify every member of the class by name, plaintiff has not even identified one prospective patient who was told plaintiff was not accepting new patients. Plaintiff has also not tried to define the class by other means, such as presenting evidence showing a certain percentage of Dr. Albracht's patients should have been plaintiff's patients. Accordingly, plaintiff's evidence is insufficient to show the alleged conduct by the Clinic interfered with an identified class of third parties.

¶ 55    Additionally, even if plaintiff had presented enough evidence regarding interference with an identified class of third parties, plaintiff failed to show when the staff received that direction. Plaintiff stated Stubbe made her statement in early February 2011, around two months before plaintiff's employment with the Association ended. According to her deposition testimony, Hoskins West did not know in early February 2011 defendant was going to keep practicing medicine beyond March 2011. Thus, if the directive were given in February 2011, the directive seems reasonable to allow plaintiff to retire from his medical practice. Such a conclusion is supported by the evidence the Clinic receptionists assisted plaintiff towards the end of March 2011 in scheduling his patients beyond March 31, 2011. Here, nothing shows the staff received such a direction in August 2010 when plaintiff's patient numbers began to decline.

¶ 56    Accordingly, we find plaintiff cannot prove as a matter of law a claim for tortious interference of a business expectancy based on the conduct alleged in count III, and thus the

circuit court properly entered summary judgment in favor of the Clinic on count III.

¶ 57          C. Clinic's Interference with Plaintiff's Contract with the Association

¶ 58          Plaintiff also argues the Clinic tortiously interfered with his contract with the Association resulting in the nonrenewal of his contract (count IV). Plaintiff notes several facts supporting this claim. One of those facts is Hoskin West's March 9, 2011, e-mail to Waldrop and others about a conversation she had with Lee regarding the Clinic sending a letter to plaintiff's patients. In the e-mail, she indicated the Clinic needed to send the local primary care physicians the Clinic's plans for "hand coverage" because a large majority of them were no longer referring their patients to plaintiff. Hoskins West's aforementioned statement is too speculative to show the Clinic was diverting patients from plaintiff to Dr. Albracht. Moreover, Terese's affidavit indicating the Hospital's emergency room staff did not mention plaintiff as an available surgeon does not show any action by the Clinic. Thus, the only evidence alleged by plaintiff supporting this claim is the decrease in plaintiff's patient numbers when the Clinic hired Dr. Albracht in August 2010 and Stubbe's statement to plaintiff in February 2011. We note the Clinic does not directly address this issue in its brief but does address this conduct in the context of plaintiff's claim the Clinic's conduct interfered with his expectancy with prospective patients.

¶ 59          Plaintiff points to the drop off in the number of patients he was seeing after Dr. Albracht arrived. Before August 2010, plaintiff saw on average 337 patients per month, and from August 2010 to March 2011, he saw on average 235 patients. Plaintiff asserts he noticed the drop off in his monthly patient numbers when he talked with Dr. Peterson about the lack of referrals from Dr. Peterson. Plaintiff talked to Stubbe after his conversation with Dr. Peterson. The Clinic contends Stubbe's alleged February 2011 statement cannot explain the decrease in plaintiff's patient numbers starting in August 2011.

¶ 60       We again agree with the Clinic plaintiff has failed to provide evidence connecting Stubbe's statement to plaintiff's decrease in patients beginning in August 2010. At the time of Stubbe's statement in early February 2011, the Association had already announced it was not renewing plaintiff's contract. If Hoskins West, who denies making any directive to her staff, made the directive after the Association's December 2010 announcement, then the conduct clearly had no effect on the contract between the Association and plaintiff. The mere existence of the decline in patients in August 2010 is insufficient to show the connection between Stubbe's statement and the decline of plaintiff's patient numbers starting in August 2010. This is especially true given plaintiff's many other allegations asserting other defendants took actions resulting in the decrease of plaintiff's patient numbers.

¶ 61       Additionally, even if the Clinic had directed its staff to tell prospective patients plaintiff was not accepting new patients in August 2011, those actions would have been directed at the patients and not the Association. The Clinic's conduct would have merely impacted plaintiff's employment expectancy with the Association. Accordingly, plaintiff's claim fails as a matter of law on this basis as well.

¶ 62       Thus, we find plaintiff cannot prove as a matter of law a claim for tortious interference of prospective economic advantage based on an interference with plaintiff's contract with the Association as alleged in count IV, and thus the circuit court properly entered summary judgment on the last remaining count against the Clinic.

¶ 63                                  III. CONCLUSION

¶ 64       For the reasons stated, we affirm the Sangamon County circuit court's judgment.

¶ 65       Affirmed.